S. DOE, a minor, and M. Doe, a minor, both by Craig W. NELSON, their guardian ad litem, M.A. Doe, V. Doe, and E. Doe, Plaintiffs,

v.

MILWAUKEE COUNTY; Milwaukee County Department of Social Services; and Thomas Brophy, Ed Konkol, Kenneth Richter, Marge Coffey, Peg McCarthy, King Taylor, and John Roe and Jane Roe, individually and in their capacities as employees and officers of Milwaukee County and the Milwaukee County Department of Social Services, Defendants.

Civ. A. No. 86–C–659.

United States District Court, E.D. Wisconsin.

May 23, 1989.

Craig W. Nelson, Piette, Nelson, Zimmerman & Dries, S.C., Milwaukee, Wis., for plaintiffs.

Robert Andrews, Milwaukee County Corp. Counsel, Milwaukee, Wis., for defendants.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

Joshua DeShaney will never know it, unfortunately, but he has had a dramatic impact on constitutional law. The case that grew out of his tragedy—decided last

February by the Supreme Court—is already affecting law suits across the country. *Compare DeShaney v. Winnebago County Department of Social Services,* 489 U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (Wisconsin officials who had reason to know that a child was being abused by his father did not violate the child's due process rights in failing to protect him from beatings that caused severe brain damage) *with Burgos v. Camareno,* 708 F.Supp. 25 (D.P.R.1989) (citing *DeShaney,* court dismisses claim that officials violated due process by failing to protect plaintiffs' buildings from burglaries). By way of local example, I recently cited the *DeShaney* case in dismissing a complaint brought against city officials who allegedly failed to detect the hazards in a house that later burned down, killing several children. *Baugh v. City of Milwaukee,* Civil Action No. 88–C–1230 (E.D.Wis. Mar. 8, 1989).

This case, too, has been touched by *DeShaney.* Like Joshua, the minor plaintiffs in this case are children who were abused by adults. As in Joshua's case, social workers were tipped off to the abuse. And here, like there, they did not protect the children from additional abuse. In fact, the defendants in this case did not even conduct an investigation upon receiving the tip—something that was done, albeit ineptly, in *DeShaney.*

Nevertheless, I am afraid that the plaintiffs in the case before me, like Joshua, can find no relief in constitutional law or federal court. Though these plaintiffs come very close to stating a claim for the deprivation of an entitlement without due process—an issue that was not addressed in *DeShaney*—their arguments ultimately fall short. For better or worse, then, their remedies, if any, must lie in tort law and state court. *DeShaney* so holds. The complaint will be dismissed.

### FACTS

The facts have been drawn from the pleadings as well as from exhibits and deposition testimony supplied by the parties.

1. To safeguard the privacy of the plaintiffs I permitted them to use pseudonyms in court

S. Doe and M. Doe[1], now eleven, were six years old in early 1985. They are the daughter and son of father M.A. Doe and mother D. Doe. V. Doe and E. Doe are M.A. Doe's parents—that is, the children's grandparents. During the relevant period, the individual defendants were employees of the Milwaukee County Department of Social Services (DSS).

In January 1985, M.A. Doe and D. Doe were separated and involved in a divorce proceeding. The mother, who was living with a male companion, had temporary custody of the children. The father was entitled to visitation, and much of his visiting occurred at the home of the grandparents.

On January 1, 1985, D. Doe and her boyfriend ordered Kathy, a live-in babysitter, to move out of their home. Kathy sought out M.A. Doe and told him she was concerned about the safety of the children. The children were being beaten and forced to participate in "Satan worship," Kathy told M.A. Doe (he recalled during his deposition). At about the same time, grandmother E. Doe noticed while bathing S. Doe that the girl's genital area was red and raw. The girl said it hurt, but would not say what had happened.

On January 10, 1985, M.A. Doe, the grandparents, Kathy, and a friend who is a registered nurse went to the Milwaukee DSS to report the suspected abuse. They were interviewed by caseworker Patricia Ryan, who is not a defendant. Based on the interview, Ryan prepared an "Access Referral" form that contained the following information. (The quotes are from her report.)

* The boyfriend had recently been released from federal prison, where he served time for bank robbery. At 6'3" and 200 pounds, he "has a violent temper, & claims to have killed at least 4 people." He scared the children with voodoo and black magic.

* Kathy was in the home "until recently" and observed "rough treatment" of the

papers.

children. "He grabs them roughly & the children have frequent bruises." The mother let him take over disciplining the kids.

* The mother and boyfriend smoked marijuana and drank heavily. The children observed them having sexual intercourse.

* The grandmother noticed that S. Doe's genital area was red and raw, but the girl would not say why. The girl had also become "quiet and uncommunicative recently & has been doing poorly in school."

* The children "begged to stay w/the grandparents," and the reporting adults "fear that boyfriend will harm children."

Ryan later testified in a deposition that she believed that the complainants' concerns were legitimate.

In the normal course of things, one of two DSS offices would handle such a report—either the protective services unit, headed by defendant King Taylor, or the child sexual abuse team, headed by defendant Margaret (Peg) McCarthy. McCarthy read the Ryan report and decided that it did not contain enough information to warrant an investigation by her staff. McCarthy and Taylor then discussed the report with their supervisor, defendant Kenneth Richter. They concluded that the matter did not call for further inquiry. The report was marked "IO"—for "information only" —and was not assigned to a caseworker for investigation.

According to McCarthy, DSS supervisors follow an unwritten policy of routinely putting an IO notation on those reports in which the information provided to the worker "does not cover things as specified in the [child abuse] statute"—when there is "not sufficient information to say that there probably was abuse or neglect or sexual abuse occurring to send a worker out." She added during her deposition:

The procedure in the department is to notify, if we know who the reporter is, of our decision to not investigate, explain usually the reasons why, what other kinds of things they can do to get additional information, what they should do if they get additional information, who to call.

In the case of the Doe children, McCarthy testified that she thought IO was an appropriate response because (1) S. Doe would not say why her genital area hurt, (2) an alleged abuser's criminal record is "not reasonable cause to suspect that he's done anything to a child unless there's additional information," (3) a person's religious beliefs "cannot be construed as a form of maltreatment," (4) S. Doe's withdrawal alone did not "meet the statutory burden of the definition" of "emotional damage" in § 48.13(11), Wis.Stat., which governs when courts can order protective services for children, and (5) "[w]e can't capriciously go out and investigate any family without reasonable cause to suspect that the children have been abused or neglected."

King Taylor contacted the grandmother and told her how the adults could gather additional information to support their suspicion. He instructed her to have M.A. Doe contact his attorney to change the children's custody arrangements. The reporting plaintiffs made a second complaint one week later, and DSS then took action to protect the children. But before they could be protected, the children were subjected to additional abuse by the boyfriend. The boyfriend was eventually charged with sexual abuse, but he and the children's mother died before any trial. They died within two months of the adult plaintiffs' first report to DSS.

In Wisconsin, the reporting and investigation of child abuse and neglect are governed by section 48.981 of the Wisconsin Statutes. Because this statute will figure prominently in my decision, the pertinent provisions of the 1985 law are reprinted here in full:

(2) PERSONS REQUIRED TO REPORT. A physician, coroner, medical examiner, nurse, dentist, chiropractor, optometrist, other medical or mental health professional, social or public assistance worker, school teacher, administrator or counselor, child care worker in a day care center

or child caring institution, day care provider, alcohol or other drug abuse counselor, member of the treatment staff employed by or working under contract with a county department under s. 46.23, 51.42 or 51.437, physical therapist, occupational therapist, speech therapist, emergency medical technician—advanced (paramedic), ambulance attendant or police or law enforcement officer having reasonable cause to suspect that a child seen in the course of professional duties has been abused or neglected or having reason to believe that a child seen in the course of professional duties has been threatened with abuse or neglect and that abuse or neglect of the child will occur shall report as provided in sub. (3). Any other person, including an attorney, having reason to suspect that a child has been abused or neglected or reason to believe that a child has been threatened with abuse or neglect and that abuse or neglect of the child will occur may make such a report. No person making a report under this subsection may be discharged from employment for so doing.

(3) REPORTS; INVESTIGATION. (a) *Referral of report.* A person required to report under sub. (2) shall immediately inform, by telephone or personally, the county department or the sheriff or city police department and, in the case of American Indian children, the tribal government of the facts and circumstances contributing to a suspicion of child abuse or neglect or to a belief that abuse or neglect will occur. The sheriff or police department shall within 12 hours, exclusive of Saturdays, Sundays or legal holidays, refer to the county department and, in the case of American Indian children, the tribal government all cases reported to it. The county department may require that a subsequent report be made in writing. Each county department shall adopt a written policy specifying the kinds of reports it will routinely report to local law enforcement authorities.

(b) *Duties of local law enforcement agencies.* 1. Any person reporting under this section may request an immediate investigation by the sheriff or police department if the person has reason to suspect that a child's health or safety is in immediate danger. Upon receiving such a request, the sheriff or police department shall immediately investigate to determine if there is reason to believe that the child's health or safety is in immediate danger and take any necessary action to protect the child.

2. If the investigating officer has reason under s. 48.19(1)(c) or (d)5 to take a child into custody, the investigating officer shall take the child into custody and deliver the child to the intake worker under s. 48.20.

3. If the police or other law enforcement officials determine that criminal action is necessary, they shall refer the case to the district attorney for criminal prosecution.

(c) *Duties of county departments.* 1. Within 24 hours after receiving a report under sub. (3)(a), the county department shall, in accordance with the authority granted it under s. 48.57(1)(a), initiate a diligent investigation to determine if the child is in need of protection or services. The investigation shall be conducted in accordance with standards established by the department for conducting child abuse and neglect investigations and shall include observation of or an interview with the child, or both, and, if possible, a visit to the child's home or usual living quarters and an interview with the child's parents, guardian or legal custodian. At the initial visit to the child's home or living quarters, the person making the investigation shall identify himself or herself and the county department involved to the child's parents, guardian or legal custodian. The county department may contact, observe or interview the child at any location without permission from the child's parent, guardian or legal custodian if necessary to determine if the child is in need of protection or services, except that the person making the investigation may enter a child's home or living quarters only with permission from the child's parent,

guardian or legal custodian or after obtaining a court order to do so.

2. If the person making the investigation determines that any child in the home requires immediate protection, he or she shall take the child into custody under s. 48.08(2) or 48.19(1)(c) and deliver the child to the intake worker under s. 48.20.

3. If the county department determines that a child, any member of the child's family or the child's guardian or legal custodian is in need of services, the county department shall offer to provide appropriate services or to make arrangements for the provision of services. If the child's parent, guardian or legal custodian refuses to accept the services, the county department may request that a petition be filed under s. 48.13 alleging that the child who is the subject of the report or any other child in the home is in need of protection or services.

4. The county department shall determine, within 60 days after receipt of a report, whether abuse or neglect has occurred or is likely to occur. The determination shall be based on a preponderance of the evidence produced by the investigation. A determination that abuse or neglect has occurred may not be based solely on the fact that the child's parent, guardian or legal custodian in good faith selects and relies on prayer or other religious means for treatment of disease or for remedial care of the child. In making a determination that emotional damage has occurred, the county department shall give due regard to the culture of the subjects and shall establish that the person alleged to be responsible for the emotional damage is unwilling to remedy the harm. This subdivision does not prohibit a court from ordering medical services for the child if the child's health requires it.

5. The county department shall maintain a record of its actions in connection with each report it receives. The record shall include a description of the services provided to any child and to the parents, guardian or legal custodian of the child. The county department shall update the record every 6 months until the case is closed.

6. The county department shall, within 60 days after it receives a report from a person required under sub. (2) to report, inform the reporter what action, if any, was taken to protect the health and welfare of the child who is the subject of the report.

In addition to the reporting statute, a pamphlet published and distributed by DSS states that "[a]ll reported cases of child abuse and neglect must be investigated." The same booklet lists various signs of abuse, including "unusual bruises," "very withdrawn or shy," "frightened of parents," "complains of pain, swelling, or itching in genital area," and "drastic change in school achievement."

This suit was initiated in June 1986. The complaint alleges violations of federal constitutional rights (actionable under 42 U.S. C. § 1983) and raises pendent state claims for negligence. The plaintiffs contend that the defendants failed to take steps to stop the abuse, failed to investigate the initial report, and failed to comply with state and federal child abuse statutes. Consequently, each minor plaintiff was deprived

> of her rights, privileges, and immunities which are secured to her by the First, Ninth and Fourteenth Amendments ..., including but not limited to her right to privacy, her right to safety in her own personal being, her right to be protected from such abuse ..., her right to essential protective services, her right to be free from bodily injury, her right to equal protection under the law, and other liberty and property interests and rights to which she is entitled as a citizen of the United States; further, all said deprivations were in violation of [plaintiff's] right to due process.

In August 1987, the defendants moved for dismissal for failure to state a claim and/or for judgment on the pleadings. With the consent of the parties, resolution of the motion was held in abeyance pending appeals in two cases, *DeShaney* and *Archie,* both of which are discussed below.

## DISCUSSION

The parties have provided testimony and exhibits from outside the pleadings, and I am not excluding these submissions. As a result, I must treat the defendants' motion for dismissal as one for summary judgment. *See* rule 12(b) of the Federal Rules of Civil Procedure. The difference in treatment, however, does not affect the outcome here, for even if all of the facts I have just related are true, the complaint still must be dismissed.[2] To be sure, the parties vehemently disagree over how the defendants' conduct ought to be characterized. "Reasonable," "negligent," and "intentional abuse of power" are some of the choices I have been offered. But unless a jury could find that the defendants behaved recklessly, in the constitutional sense, the defendants are entitled to win. (I will address the recklessness standard in a few moments.)

Some of the plaintiffs' federal claims can be dismissed rather speedily. The fourteenth amendment's due process clause does not afford a right to governmental protective services, "even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at ——, 109 S.Ct. at 1003. In other words, the defendants were not obligated to protect the Doe children from their mother's boyfriend, who was a private actor. *Id.* Though an argument can be made that government *should* assume such an obligation under the Constitution,[3] the Supreme Court believes that government is not so obligated at present.

Thus, the plaintiffs were not deprived of liberty without due process. The due process clause protects people from government, not from one another. *Id.* Under the reasoning of *DeShaney*, the Does have suffered an ordinary tort at most, not a constitutional injury, and their redress, if any they have, must be found in Wisconsin law. This determination is unaffected by *State of Wisconsin v. R.A.R.*, 147 Wis.2d 218, 432 N.W.2d 685 (1988), which is clearly distinguishable.

Similarly, the defendants did not deny the Does equal protection under the law. Indeed, the plaintiffs make no allegation that they were deprived of protection by DSS on account of their race, sex, or even age. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (government cannot selectively deny services to racial minorities).

The Does maintain that they should escape the holding of *DeShaney* for several reasons. First, they say, Joshua complained only of a loss of liberty, whereas the Does raise property, privacy, and first amendment claims in addition to a liberty claim. Second, the Does argue that the defendants in *DeShaney* complied with the Wisconsin statute requiring investigation of child abuse reports, whereas the defendants here launched no investigation at all. According to the Does, these defendants' intentional, routine policy of not investigating some reports surpasses the *DeShaney* defendants' negligence. The IO system, they say, amounts to an unjustifiable and arbitrary abuse of power that is actionable under 42 U.S.C. § 1983. And, making a connected argument, they assert that DSS holds a monopoly on protection against child abuse in Milwaukee, so the Does had nowhere else to turn for help. Put another way, the Does contend that they were placed in a worse position by DSS than they would have been if there was no such agency.

The last argument is based on §§ 48.-981(2) and 48.981(3), Wis.Stat., which channel child abuse reports to the local DSS. The same argument was urged upon the *DeShaney* majority by the dissenting Supreme Court Justices. See 489 U.S. at

---

**2.** In their answer, the defendants deny that they failed to take any steps which would protect the minor plaintiffs from continued abuse.

**3.** Or even a larger responsibility. *See, e.g.,* Edelman, "State Action Created the Poverty Trap, And Should Spring It," *Legal Times,* March 6, 1989, at 20 (asserting that Court should recognize substantive due process right to a survival income).

——, 109 S.Ct. at 1011 (Brennan, J., dissenting) ("If DSS ignores or dismisses these suspicions, no one will step in to fill the gap."). For its part, the majority held that Winnebago County's DSS did *not* place Joshua in a worse position by returning him to his abusive father's home after it had assumed temporary custody of the boy. *Id.* at ——, 109 S.Ct. at 1006. The majority's reasoning on this point may have been less than compelling, but since the very argument made by the Does failed in *DeShaney*—an analogous case under Wisconsin law—I feel constrained to reject it here as a matter of precedent.

The issue of government's monopoly over protection was also discussed in *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988), *cert. pending*. In *Archie*, the Court of Appeals for the Seventh Circuit ruled that a Racine fire dispatcher did not violate the fourteenth amendment rights of an ailing woman when he refused to send out a rescue squad for reasons that someone could say were "stupid." (The "stupid" adjective was mine. *See* 627 F.Supp. 766, 771 (E.D.Wis.1986)). The appeals court conceded that governmental bodies would be obligated to provide affirmative aid if they "stripped away avenues of self-help" by, for example, forcing private ambulance services out of business. 847 F.2d at 1222–23.

But if the woman in *Archie* could have called a private ambulance, as the appeals court suggested, *id.* at 1223, then the Doe adults likewise could have asked the judge presiding over the parents' divorce case to remove the children from the custody of their mother. King Taylor even advised them to follow that route. In any event, the *DeShaney* opinion seems to limit the applicability of *Archie*'s monopoly exception to those instances in which government actually restrains a person, such as a prisoner. 489 U.S. at ——, 109 S.Ct. at 1004–07 (presence of "special relationship" between individuals and the state can impose a duty to protect on government). The defendants did not restrain the Does.

*Archie* also sheds light on one of the other arguments put forward by the Does—that *DeShaney* is distinguishable because Winnebago County caused injury negligently while Milwaukee County did so intentionally. The court of appeals differentiated between conduct that is intentional in ordinary tort law and that which is intentional in constitutional law. In constitutional parlance, it is "reckless" behavior that deprives a person of life or liberty without due process. 847 F.2d at 1218–19. A reckless act is one that reflects "complete indifference" to risk—when the actor does not care whether the other person is injured. *Id.* at 1219.

In this case, a jury could not find that the defendants' conduct evinced constitutional recklessness. After all, the three supervisors discussed the Doe children's situation; Taylor told those who had reported the abuse how to try again; and McCarthy identified a number of factors that led her to affix the IO label to the first report. The defendants' actions may have been negligent under Wisconsin's common law, but they do not cross the constitutional threshhold. *See id.* at 1219 (even gross negligence does not violate due process clause).

■ The Does' strongest argument concerns their alleged loss of "property interests," or the deprivation of an entitlement without due process. The theory goes like this: Wisconsin law requires the defendants to investigate reports of suspected child abuse (and investigations must include interviews with or observations of the children). The statute's mandatory language gives rise to an entitlement to such investigations. The defendants violated this property right because they did not investigate the first report about S. Doe and M. Doe. And because the defendants did not give the plaintiffs due process before depriving them of their entitlement, the defendants violated the fourteenth amendment. *See Archie*, 847 F.2d at 1217 (suggesting that Racine residents can claim property interest in having fire department respond to emergency calls where municipal code imposes such duty; but "[i]t is hardly possible to hold hearings in advance

to decide whether fire dispatchers will turn deaf ears to cries of distress.")

In *DeShaney*, the Supreme Court explicitly reserved judgment on the kind of property claim asserted here by the Does. In a footnote, the Court observed that

> Petitioners also argue that the Wisconsin child protection statutes gave Joshua an "entitlement" to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation under our decision in *Board of Regents v. Roth*, 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972). Brief for Petitioners 24–29. But this argument is made for the first time in petitioners' brief to this Court: it was not pleaded in the complaint, argued to the Court of Appeals as a ground for reversing the District Court, or raised in the petition for certiorari. We therefore decline to consider it here.

489 U.S. at ——, 109 S.Ct. at 1003 n. 2 (citations omitted).

Of course, even assuming that the defendants in *DeShaney* did not violate the elaborate protective scheme of the Children's Code—which is unlikely—the added twist of a statutory violation does not, by itself, provide the Does with a federal cause of action. "State rather than federal courts are the appropriate institutions to enforce state rules." *Archie*, 847 F.2d at 1217. However, "[i]n one respect, and in one only, state law provides the basis for a claim under the Due Process Clause. Because 'property' is defined by law, showing that one has 'property' often depends on showing a legitimate claim of entitlement under state law." *Id.*

An entitlement is not present where an individual has only "an abstract need or desire" for the benefit. "He must have more than a unilateral expectation of it." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. *See Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) ("the sufficiency of the claim of entitlement must be decided by reference to state law").

Do the Wisconsin statutes give the Does a legitimate claim of entitlement to an investigation by DSS? Almost, but not quite. Section 48.981(3)(c) compels a county social service department to conduct an investigation when a report is received "under sub. (3)(a)"—that is, when the report comes from law enforcement authorities or one of the persons *required* to report under section 48.981(2). There is nothing in the statute that forces a DSS to investigate a report from "other person[s]" who "may" make a report but are not required to do so under section 48.981(2). The Does were not required to report abuse to DSS. (They do not claim that the friend who is a registered nurse saw the children "in the course of professional duties.") In these circumstances, they cannot claim an entitlement to a mandatory investigation.

I realize that my parsing of the statute's language is not particularly generous to the victims in this case. But I have to assume that the Wisconsin Legislature meant what it said when it delineated the instances in which county departments must investigate within twenty-four hours. The legislature used broader language in the preceding subsection that governs immediate investigations by police. § 48.981(3)(b), Wis.Stat. (*"[a]ny person* reporting under this *section ..."*). It also used broader language in section 48.-981(3)(c)4, which requires each DSS to "determine"—not "investigate"—"within 60 days after receipt of *a report,* whether abuse or neglect has occurred or is likely to occur." In the statutory scheme, county welfare agencies must act faster and more thoroughly on reports from those required to report than on reports from those who report voluntarily. The requirement that police departments conduct investigations in emergencies was apparently intended to fill any gaps in the arrangement.

I would be usurping the Wisconsin Legislature's authority to define property if I were to create an entitlement at odds with the existing hierarchy of benefits. The legislature, not a federal court, is the proper body to decide that county social service departments should investigate *all* reports, not just those from physicians and other

professionals, within twenty-four hours. For this reason, I find that the Does had no property interest in an investigation of their report.[4] Because they had no entitlement to begin with, their due process rights were not denied by the defendants.[5]

It remains possible that section 48.-981(3)(c)4 creates an entitlement to a "determination" within sixty days, as opposed to an "investigation" within twenty-four hours. Yet this is not the case to decide the question. The mother of the Doe children and her boyfriend were dead within sixty days of the report to DSS. So there is no justiciable controversy over the defendants' compliance with section 48.981(3)(c)4.

 Having addressed the property issue, I am left with two other federal claims—the privacy and first amendment theories. Neither persuades me. If private violence did not deprive Joshua *De-Shaney* of his due process liberty interest, then, under *DeShaney*, private violence did not deprive the Does of their right to privacy. *See Rush v. Johnson*, 702 F.Supp. 1416 (N.D.Ill.1989) (citing the appeals court decision in *DeShaney*, district court dismisses complaint alleging that Illinois social workers deprived a child of her right to "bodily integrity" by failing to investigate reports that she was being abused). And the first amendment does not require government to listen or respond to persons who petition for a redress of their greivances. *Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 465, 99 S.Ct. 1826, 1826, 60 L.Ed.2d 360 (1979) (per curiam). As I pointed out, the defendants were also under no statutory obligation to respond to the Does within twenty-four hours.

These child abuse cases are tough. The welfare agencies get sued if they fail to intervene and also if they do take action. *See, e.g., Woodrum v. Woodward County*, 866 F.2d 1121 (9th Cir.1989) (affirming dismissal of complaint that authorities violated family's liberty interest by investigating report of abuse). Though *DeShaney* has its problems, I think the Supreme Court was right in the end when it suggested that a political solution is more appropriate than judicial intervention:

> The people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one.

489 U.S. ——, 109 S.Ct. at 1007. If the cap on Wisconsin government's liability for damages is too low, that can be changed by the democratic process as well.

For all of the foregoing reasons, the defendants are GRANTED summary judgment, and the plaintiffs' complaint is DISMISSED. The complaint is dismissed without prejudice so the plaintiffs can pursue their remedies in state court.[6]

SO ORDERED.

---

**4.** Nor does the DSS booklet—which has no force of law—create an entitlement. Similarly, the federal Child Abuse Prevention and Treatment Act does not require counties to investigate child abuse reports. It declares that states may receive federal grants if they "provide that upon receipt of a report of known or suspected instances of child abuse or neglect an investigation shall be initiated promptly to substantiate the accuracy of the report...." 42 U.S.C. § 5103(b)(2)(C). Noncompliance is punished by withdrawal of federal funding.

**5.** Accordingly, I am not deciding whether the Does had a substantive or a procedural due process right. *Compare Brown v. Brienen*, 722 F.2d 360, 368 (7th Cir.1983) (Flaum, J., concurring) (property rights subject only to procedural due process analysis) *with Schaper v. City of Huntsville*, 813 F.2d 709, 717 n. 8 (5th Cir.1987) (holding in *Brienen* undermined by subsequent Supreme Court decisions).

**6.** Because I am rejecting all of the plaintiffs' federal claims, I am simultaneously dismissing their state negligence claims in the exercise of my discretionary pendent jurisdiction.