S. DOE, a minor, M. Doe, a minor, both by Craig W. NELSON, their Guardian ad Litem, M.A. Doe, V. Doe and E. Doe, Plaintiffs–Appellants,

v.

MILWAUKEE COUNTY, Milwaukee County Department of Social Services, Thomas Brophy, Ed Konkol, Kenneth Richter, Marge Coffey, Peg McCarthy, King Taylor, John Roe and Jane Roe, individually and in their capacities as employees and officers of Milwaukee County and the Milwaukee County Department of Social Services, Defendants–Appellees.

No. 89–2304.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1990.

Decided May 31, 1990.

Craig W. Nelson and James J. Jacobson, Piette, Nelson, Zimmerman & Dries, Milwaukee, Wis., for plaintiffs-appellants.

Robert E. Andrews, Milwaukee, Wis., for defendants-appellees.

Before WOOD, Jr., CUDAHY and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Child abuse is always a tragedy, and that tragedy is compounded when the abuse could have been prevented by timely intervention. Federal and state governments have increasingly devoted resources to prevent child abuse, but, unfortunately, the governmental measures devised do not always accomplish their goals. The minor plaintiffs in this case, S. and M. Doe,[1] the children's father, M.A. Doe, and their grandparents, V. Doe and E. Doe, charge that the Milwaukee County Department of Social Services (the "DSS") violated federal and state law by failing to initiate an imme-

diate investigation of their father and grandparents' report of suspected child abuse by their mother and her live-in boyfriend. The district court dismissed the Does' complaint for failure to state a federal claim. Particularly in light of the Supreme Court's recent decision in *DeShaney v. Winnebago County Department of Social Services*, —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and the body of case law governing the Does' procedural due process claims, we affirm.

## I. FACTUAL BACKGROUND

During the period of the alleged abuse, the Doe children were residing with their mother and her live-in boyfriend; the Doe parents were at that time engaged in divorce and custody proceedings. Pursuant to his visitation rights under the separation agreement, M.A. Doe arranged to spend time with his children at his parents' (the children's grandparents') home. E. Doe was bathing her granddaughter when she noticed that the child's genital area was "red and raw." Although the girl complained of pain in the area, she refused to tell her grandmother what had caused the soreness. M.A. Doe and his parents became acutely concerned about the possibility of child abuse when Kathy, the mother's live-in babysitter, approached them, having been fired by the mother, and informed them of her worries that the children were suffering harsh discipline and mental and emotional abuse at the hands of their mother's boyfriend. Together with Kathy and a friend who was a registered nurse, M.A. Doe and his parents went to the DSS on January 10, 1985, to file a report of suspected child abuse.[2]

---

**1.** The district judge permitted the plaintiffs to use the pseudonym "Doe" to protect their privacy.

**2.** As recorded by the district court, the Does reported the following information to the DSS intake caseworker, Patricia Ryan:

    1. The mother's boyfriend had recently been released from federal prison, where he served time for bank robbery. At 6'3" and 200 pounds, he "has a violent temper, & claims to have killed at least 4 people." He scared the children with voodoo and black magic.

    2. Kathy was in the home "until recently" and observed "rough treatment" of the children. "[The boyfriend] grabs them roughly & the children have frequent bruises." The mother let him take over disciplining the kids.

    3. The mother and boyfriend smoked marijuana and drank heavily. The children observed them having sexual intercourse.

    4. The grandmother noticed that S. Doe's genital area was red and raw, but the girl would not say why. The girl had also become "quiet and uncommunicative recently & has been doing poorly in school."

Both King Taylor, head of the protective services unit of the DSS, and Margaret ("Peg") McCarthy, head of the Department's child sexual abuse team, reviewed the Does' report. McCarthy concluded that the report did not contain sufficient information to warrant an investigation by her group. McCarthy and Taylor discussed the matter together and then brought it before their supervisor, Kenneth Richter. The three determined that an investigation was not warranted on the basis of the Does' report and marked the report "IO" ("information only"). King Taylor telephoned the children's grandmother, advised her of the Department's determination, and suggested that M.A. Doe contact his attorney about the children's custody arrangements.

The Does made a second report a week later, at which time the DSS took action to protect the children. The Does allege that the children suffered additional abuse by the boyfriend in the interim. The boyfriend was subsequently charged with sexual abuse, but he and the children's mother died within two months of the Does' initial report to the DSS. Presumably, then, the children are now in their father's custody, and the abuse has ceased.

The Does allege that the DSS was required by section 48.981(3)(c) of Wisconsin Statutes Annotated (West 1987) to initiate an investigation within 24 hours of their initial report of suspected child abuse.[3] Because the DSS failed to investigate that report, the Does charge that the children suffered additional physical, sexual and mental abuse. The Does sued the DSS in federal district court under 42 U.S.C. section 1983, asserting that the DSS's inaction violated the Does' rights under the First, Ninth and Fourteenth Amendments to the United States Constitution. Specifically, the Doe children alleged violations of their rights to privacy, to safety in their own personal beings, to protection from the child abuse alleged, to essential protective services, to freedom from bodily injury, to equal protection under the law and to "other liberty interests to which [they] are entitled as [ ] citizen[s] of the United States." R. 1, ¶¶ 21 and 37. The adult Does claimed that the DSS's inaction deprived them of their rights to the integrity and protection of their family relationship, to the protection of the children from the abuse alleged, to essential protective services, to equal protection under the law and to other liberty interests of United States citizens. *Id.* at ¶¶ 53, 69, 85. Finally, each of the Does alleged that all these deprivations violated

5. The children "begged to stay w/the grandparents," and the reporting adults "fear that boyfriend will harm children."
*Doe v. Milwaukee County,* 712 F.Supp. 1370, 1371–72 (E.D.Wis.1989) (quoting report of Patricia Ryan, *reprinted in* Appellants' App. at 26–27).

**3.** Section 48.981(3)(c) provides in pertinent part:
(c) *Duties of county departments.* 1. Within 24 hours after receiving a report under sub. (3)(a), the county department shall ... initiate a diligent investigation to determine if the child is in need of protection or services. The investigation shall be conducted in accordance with standards established by the department for conducting child abuse and neglect investigations and shall include observation of or an interview with the child, or both, and, if possible, a visit to the child's home or usual living quarters and an interview with the child's parents, guardian or legal custodian....
Subsection (3)(a) in turn provides that
[a] person required to report under sub. (2) shall immediately inform ... the county [social services] department or the sheriff or city police department ... of the facts and circumstances contributing to a suspicion of child abuse or neglect or to a belief that abuse or neglect will occur. The sheriff or police department shall within 12 hours, exclusive of Saturdays, Sundays or legal holidays, refer to the county department ... all cases reported to it....
Persons "required to report under subsection 2" are medical and mental health professionals, social workers, counselors and public assistance workers, school teachers and day care providers and law enforcement officers "having reasonable cause to suspect that a child seen in the course of professional duties has been abused or neglected or having reason to believe that a child seen in the course of professional duties has been threatened with abuse or neglect and that abuse or neglect of the child will occur...." Subsection 2 also *authorizes,* but does not require, "any other person ... having reason to suspect that a child has been abused or neglected or reason to believe that a child has been threatened with abuse or neglect and that abuse or neglect of the child will occur" to make a report of child abuse.

their rights to due process. The Does each claimed $1 million in damages.[4]

## II. THE DOES' DUE PROCESS CLAIM

■ The district court found the Does' federal due process claims precluded by the Supreme Court's decision in *DeShaney* and our en banc decision in *Archie v. City of Racine,* 847 F.2d 1211 (7th Cir.1988) (en banc), *cert. denied,* — U.S. —, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). We agree with this conclusion.

To the extent that the Does seek to assert a liberty interest in having the DSS investigate and protect against the abuse endured by the Doe children at the hands of their mother and her beau, they are squarely barred by *DeShaney* (a similar child abuse case). The mother's boyfriend, like Joshua DeShaney's father, was a *private* actor; according to *DeShaney,* the language of the due process clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests [protected by the clause] do not come to harm through other means." 109 S.Ct. at 1003. The Court also declined to find that the state had formed a constitutionally cognizable "special relationship" with Joshua DeShaney by temporarily taking him out of his abusive father's custody[5]; since the state itself did not inflict any harm upon Joshua—his father took care of that task—the state could not be held liable under section 1983 for the boy's severe injuries.[6] In the case before us, the DSS made no effort at all to intervene on the Doe children's behalf. Under *DeShaney*'s clear pronouncement, the DSS's failure to initiate an investigation, while possibly misguided, did not violate the Does' substantive due process rights.

■ Faced with the obstacle posed by *DeShaney* to their substantive due process challenge, the Does have attempted to assert a violation of their *procedural* due process rights. They base this change of course on footnote 2 of the *DeShaney* opinion, in which the Supreme Court declined to address Joshua's untimely claim of "entitlement" to receive protective services in accordance with the terms of the statute. 109 S.Ct. at 1003 n. 2. The Does argue in this court that section 48.981 has vested them with a property interest in having the DSS investigate a report of child abuse within 24 hours. We disagree.

While "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money," *Board of Regents v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), not every state or municipal law, regulation or ordinance creates a constitutionally protected entitlement. In resolving a claim based on procedural due process, we must be careful to distinguish the substantive right from the procedure designed to prevent its arbitrary deprivation. Justice Blackmun recently reiterated the importance of this distinction: "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch,* — U.S. —, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (citing *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 1913–14, 68 L.Ed.2d 420 (1981)).

It is essential, therefore, to a proper analysis of a procedural due process claim,

---

4. The Does also asserted pendent state negligence claims, which we do not address here.

5. In cases such as *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court has found the state bound to take affirmative action to ensure the safety and general well-being of those whom it has taken into *actual* physical custody. The rationale for these cases, as explained by Chief Justice Rehnquist in *DeShaney,* is that "when the State by the affirmative exercise of its power

so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." 109 S.Ct. at 1005–06.

6. The Supreme Court in *DeShaney,* of course, did not comment upon Joshua's right to maintain a state tort suit against the DSS.

like that urged by the Does in this case, that the court not confuse substance with process. One *cannot* have a "property interest" (or a life or liberty interest, for that matter) in mere procedures because

> [p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a claim of entitlement.... The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.

*Olim v. Wakinekona,* 461 U.S. 238, 250–51, 103 S.Ct. 1741, 1748–49, 75 L.Ed.2d 813 (1983); *Cain v. Larson,* 879 F.2d 1424, 1426 (7th Cir.) ("It is by now well-established that in order to demonstrate a property interest worthy of protection under the fourteenth amendment's due process clause, a party may not simply rely upon the procedural guarantees of state law or local ordinance."), *cert. denied,* — U.S. ——, 110 S.Ct. 540, 107 L.Ed.2d 537 (1989). Courts have observed the confusion that would result from elevating a state-mandated procedure to the status of a constitutionally protected property interest. *See, e.g., Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985) ("The categories of substance and process are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology."); *Shango v. Jurich,* 681 F.2d 1091, 1101 (7th Cir.1982) ("Constitutionalizing every state procedural right would stand any due process analysis on its head.").

The district court concluded that the Does had failed to demonstrate a property interest in having the DSS conduct an investigation of their report because the Does were not required by section 48.981(2) to report suspected abuse.[7] Wisconsin case law lends support to this conclusion.

*State v. Williquette,* 129 Wis.2d 239, 385 N.W.2d 145, 154 (1986) (statute does not require parent to report suspected child abuse, but it does not relieve parent of common law duty to protect children from known abuse). But even if the Does *were* required to report under that provision, we still could not find that they possessed a property interest in having the DSS undertake an investigation of their report.[8] Section 48.981 is, in essence, a set of *procedures* that guides Wisconsin counties in their efforts to prevent child abuse. Unarguably, these procedures assist the county in conferring the benefit of government protection upon Wisconsin's minor residents. But the procedures themselves are not "benefits" within the meaning of Fourteenth Amendment jurisprudence.

In considering whether a particular state law creates an entitlement protected by the due process clause, we have sometimes looked to the functional definition articulated by Judge Hufstedler in *Geneva Towers Tenants Org. v. Federated Mortgage Investors,* 504 F.2d 483, 495–96 (9th Cir. 1974) (Hufstedler, J., dissenting). As she explained it,

> An entitlement is a legally enforceable interest in receiving a governmentally conferred benefit, the initial receipt or the termination of which is conditioned upon the existence of a controvertible and controverted fact. Such an interest cannot be impaired or destroyed without prior notice to the beneficiary and a meaningful opportunity for him to be heard for the purpose of resolving the factual issue.

*Accord Eidson v. Pierce,* 745 F.2d 453, 459–60 (7th Cir.1984) ("[A] legitimate claim of entitlement is created only when the statutes or regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing."); *Scott v. Village of Kewaskum,* 786 F.2d 338, 339–40 (7th Cir.1986) (legitimate claim

---

7. The Does also assert that the district court's interpretation of section 48.981(3) violates the equal protection clause. We defer discussion of this claim to Section III of the opinion.

8. Consequently, the Does gain no advantage from their belated assertion in their Reply Brief at 2 that the children's former babysitter, Kathy, was a "day care worker" required under sections 48.981(2) and (3)(a) to report her suspicions of child abuse.

of entitlement, as described in *Roth*, is "an entitlement that stands or falls on the application of rules to facts."). If there is no "controvertible and controverted" factual issue, there is obviously no point in holding a hearing. Judge Hufstedler's approach does not address the distinction between substance and procedure; rather, it provides a mechanism for determining how *securely* an individual holds a substantive interest under a particular statute or regulation. *See Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983) ("[P]roperty is what is securely and durably yours under state … law as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain."); *Cornelius v. LaCroix*, 838 F.2d 207, 210 (7th Cir.1988) ("People have a legitimate claim of entitlement to keep that which presently securely belongs to them.").

Applying this principle to the case before us, we find the Does' claim of entitlement to an investigation untenable. The Does do not specify to *whom* the claimed entitlement belongs. It would make no sense to hold that the person filing the report has an entitlement to an investigation, although that person normally has some interest in having her report looked into. Far from creating a property interest, the statute in fact mandates the imposition of criminal penalties upon a person required to report suspected child abuse who wilfully fails to do so. *See* Wis.Stat.Ann. § 48.981(6) (West 1987); *State v. Hurd*, 135 Wis.2d 266, 400 N.W.2d 42 (App.1986). Thus, the investigation cannot be considered a "benefit" to the person making the report of abuse, even when the statute requires that person to report and orders the counties to investigate that person's report. The intended beneficiaries of section 48.981 are, obviously, Wisconsin's children. Yet they must

wait and suffer abuse *unless and until* someone else makes a report to the DSS. The benefit, therefore, is entirely contingent upon the perceptiveness and diligence of third parties. Consequently, it is impossible to say that the right to an investigation of a report of child abuse "securely and durably" belongs to anyone at all.[9]

The elusiveness of the Does' claimed entitlement is further emphasized by application of Judge Hufstedler's functional test. What process could possibly suffice to prevent the wrongful "deprivation" of an investigation that is supposed to be accomplished within 24 hours of the filing of the report? Under the three-part test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the most pre-deprivation process the Does could obtain would be an evidentiary hearing. But a hearing would take at least 24 hours to complete. Moreover, no "controvertible and controverted" fact could be established at a hearing that would demonstrate the Does' entitlement to the investigation. In that regard, our decision in *Archie* informs the result in this case. In *Archie*, we held that an ambulance dispatcher's refusal to send an emergency rescue squad to the home of a hyperventilating woman, who later died of respiratory failure, while possibly tortious, did not amount to a violation of substantive or procedural due process. The logic of *Archie* clearly applies to this case: not every violation of state law infringes upon constitutional rights. *Archie*, 847 F.2d at 1216–18 (citing *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402–03, 88 L.Ed. 497 (1944)). Should a fire department be required to hold a hearing before failing to appear at a reported blaze, lest it run afoul of the Fourteenth Amendment? Such a rule would trivialize the Constitution and circumvent the Supreme Court's decision in *Pennhurst State School*

**9.** More likely, it seems to us, the provision for investigation of required reports is designed to strike a balance between the state's interest in protecting children and individual families' interest in privacy from state intrusions. Thus, the statute can be seen as establishing a procedure by which the state may deprive a family of its liberty interest in privacy. *Cf. DeShaney*, 109 S.Ct. at 1007 (Had county officials "moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection."). We express no view on the constitutionality of the statute as it implicates the privacy interests of families whom the DSS investigates.

& Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Eleventh Amendment bars federal courts from ordering state officials to comply with state law). The proper means for the Does to obtain enforcement of section 48.981 (or damages for the DSS's violation of it) is through an action brought in Wisconsin court.[10]

### III. THE DOES' EQUAL PROTECTION CLAIM

■ As we observed earlier, the district court ruled that section 48.981 does not mandate a county investigation of reports made by persons other than those *required* by subsection 2 to report suspected child abuse. The Does contend that this interpretation of section 48.981, which the Wisconsin Supreme Court appears to have accepted in *State v. Williquette*, 129 Wis.2d 239, 385 N.W.2d 145 (1986), violates their rights to equal protection under the law because it results in the irrational differential treatment of reports filed by members of the general public. We disagree.

It is obvious why Wisconsin might want to make a distinction between the way in which counties handle required reports and the way they treat authorized reports. The persons listed in subsection 2 of the statute are those who see children *in the course of their professional duties.* Presumably, the Wisconsin legislature believes that these persons possess specialized training or experience that enables them to spot the often subtle signs of child abuse. Moreover, persons who see children in the course of their professional duties are likely to be disinterested in custody matters. The state legislature must also take into consideration the costs of requiring investigations, in terms both of budgetary constraints and of intrusions into the personal lives of the state's residents. The state

could rationally choose to allocate more resources to reports made by skilled and experienced professionals than to those made by members of the population at large. Further, the state could reasonably conclude that reports by skilled professionals would in general be more reliable and would therefore result in fewer unnecessary intrusions into families' personal lives. The district court's interpretation of section 48.981 does not violate the equal protection clause.[11] The Wisconsin legislature or judiciary could, of course, adopt the Does' view that section 48.981 requires investigation of *all* child abuse reports, but such a decision would be purely a matter of state law and policy; neither interpretation of the statute would implicate the federal Constitution.

The judgment of the district court is, therefore,

AFFIRMED.

---

**10.** We express no opinion as to whether Wisconsin law permits such a suit against a county or county officials. Nor need we address the applicability of this circuit's en banc decision in *Easter House v. Felder*, 879 F.2d 1458 (7th Cir. 1989) (en banc), *judgment vacated*, — U.S. ——, 110 S.Ct. 1314, 108 L.Ed.2d 490 (1990) (remanding case for consideration in light of *Zinermon v. Burch*, — U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)).

**11.** The Does also argue that the district court erred in granting the county summary judgment when there was a factual dispute concerning whether the DSS acted intentionally or recklessly. We do not reach this point, however, since we decide that the Does have failed to state a claim under section 1983.