**STATE of Missouri, Respondent,**

v.

**Michael FOOTE, Appellant.**

**No. 55306.**

Missouri Court of Appeals,
Eastern District,
Division Three.

May 29, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 1990.

Application to Transfer Denied
July 31, 1990.

Henry B. Robertson, Asst. Public Defender, St. Louis, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

SMITH, Judge.

Defendant appeals from his conviction of first degree murder and resultant sentence of life imprisonment without possibility of

parole. The state did not seek the death penalty.

The victim was Alfred Foote, Jr., defendant's nephew. Because defendant challenges the sufficiency of the evidence to support the conviction some statement of the facts supportive of the verdict is required. Defendant lived with his mother. On the evening of the murder the mother had been taken to the hospital suspected of having had a heart attack. She was taken by one of defendant's brothers, Gregory. Several other brothers were at the house including Alfred Foote, the father of the victim. The victim's brother, Michael (hereinafter little Michael to distinguish him from the defendant) and the victim were also present. The two boys were respectively seven and ten years of age. Alfred, several brothers and friends decided late in the evening to go to the house of a friend where they engaged in some drinking. They left the victim and little Michael in the care of defendant. Little Alfred and little Michael got into an argument over a candy bar their father had left them. Defendant struck little Alfred hard several times on the forehead and Alfred began crying. After he had stopped, the two boys went to bed. Alfred, Sr. and two of his friends returned to the house around midnight. He went to awaken the boys to return to their home but found only little Michael in the bed. Little Michael, when awakened, told his father he did not know where his brother was. Slim Wyatt, a friend accompanying Alfred Sr. heard little Michael state that the defendant had taken Alfred, Jr. to the basement. It is not clear from the testimony whether anyone else was in the room or heard this statement.

The men began searching for Alfred, Jr. During the search Alfred, Sr. went into the basement and found the door open, which was unusual. He also saw the defendant coming into the back yard from the alley behind the house. Alfred, Sr. asked defendant where Alfred, Jr. was and defendant answered he did not know. Defendant then walked away, not answering when called. When he returned Alfred Sr. began physically struggling with defendant who did not return the blows. Police were summoned and arrested defendant for disturbing the peace. When arrested defendant was wearing jeans with bloodstains on them.

Eventually police followed a trail of blood drops from the basement to the rear of a vacant house several hundred feet away. There they found the body of Alfred, Jr. covered with plastic and plastic bags. He had been decapitated. The head was lying near the body. Brains were lying nearby. Electrical cords were found under the body. One of the cords had been seen in the basement of defendant's house previously. There were multiple wounds to the victim's head and defense cuts on his hands. The head wounds were administered by a cylindrical blunt instrument. Death originated from the head wounds. The victim was dead before the decapitation. That act was accomplished by a sharp object utilizing a sawing motion.

In the basement of defendant's home police found a pool cue containing blood. Bloodstains in the basement, on leaves located between the basement and the location of the body and near the body, and on the pool cue were compatible with the victim's blood. Bloodstains on defendant's jeans were similarly compatible. None of the stains were compatible with defendant's blood. In the defendant's home police found plastic sheeting, an empty box of plastic bags, and a knife under defendant's mattress. The knife could have been utilized for decapitation.

On appeal defendant raises six points. One is a *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) challenge. Three involve an attack on the bloodstain testimony, one, involving three subpoints, challenges little Michael's statement, and one challenges the sufficiency of the evidence. We will discuss the issues in that order.

### I.

#### The Batson Challenge

■ The prosecution utilized five of its peremptory challenges to remove black veniremen. Two blacks were initially seated

as jurors and a black alternate became a juror when another juror was excused during trial. The defendant in this case was black as was the victim and all the non-police, non-expert witnesses. The case is not one where a discriminating prosecutor would perceive an advantage in striking blacks from the jury. *State v. Hood*, 745 S.W.2d 785 (Mo.App.1988) [5]. The trial court held an extensive hearing on the prosecutor's utilization of his strikes. The court dictated into the record an extensive set of findings to support its denial of the *Batson* claim. The prosecutor stated he desired no jury members who had exposure to scientific testings methods fearing that in that area a little knowledge could be dangerous. He exercised his peremptories as to that category of veniremen as to both blacks and whites. He additionally struck one venireman who had a long history of unemployment, and two veniremen whose brothers had been arrested. The trial court was satisfied with the prosecutor's explanations. We find no abuse of the trial court's considerable discretion.

## II.

### *The Bloodstain Evidence*

Defendant posits three claims of error concerning the bloodstain evidence. The claims are interrelated. The tests performed to establish the compatibility of the bloodstains to the victim's blood and its non-compatibility to defendant's blood was a system known as the multisystem method of electrophoresis. It consists, overly simply stated, of exposing threads containing the dried blood to an electrical charge. The threads are placed into a gel before the charge. The charge causes the enzymes in the blood to form a series of bands in the gel which bands identify the enzymes contained in the blood. The blood of defendant differed from that of the victim only as to one subgroup of the enzyme PGM. Defendant's blood has PGM 1 while the victim's was PGM 2–1. There are no cases in Missouri which have upheld the admissi-

bility specifically of the multisystem method of electrophoresis.[1]

Initially defendant attacks the acceptability of the test utilized. The standard to be applied for determining the admissibility of new scientific techniques is that articulated in *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923). *Alsbach v. Bader*, 700 S.W.2d 823 (Mo. banc 1985) l.c. 828; *State v. Onken, supra.* As stated in *Frye, supra,* l.c. 1014:

"... while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

Scientifically accepted principles are those which have proven to have wide following in the relevant scientific community to the point where, although possibly still controversial, the great majority of scientists in the field acknowledge their legitimacy. *State v. Johnson*, 42 N.J. 146, l.c. 171, 199 A.2d 809, l.c. 823 (1964) [14]. In this case the trial court held an extensive pre-trial hearing concerning the acceptance of the multisystem method of electrophoresis. Testimony was adduced from Donna Bell, a biologist employed as a criminalist by the St. Louis Police Department, Mark D. Stolorow, Laboratory Director of the Illinois State Police with an M.S. in forensic chemistry, and Dr. Henry Gershowitz, a Ph.D. in genetics and Professor of Human Genetics at the University of Michigan. All three testified at length to the accuracy of electrophoresis and the multisystem method and to their acceptance in the relevant scientific community. This testimony also revealed that all states which have considered the question have admitted the evidence, save Michigan. *See, People v. Young*, 425 Mich. 470, 391 N.W.2d 270 (1986). *Commonwealth v. Gomes*, 403 Mass. 258, 526 N.E.2d 1270 (1988) [1] (listing the states in which the

---

1. It is possible, maybe even probable, that the testing method utilized and upheld in *State v. Onken,* 701 S.W.2d 518 (Mo.App.1985) [2–4] was in fact the electrophoresis method although delineated in the opinion as the Bloodstain Analysis System.

issue has been addressed.) *See since Gomes, Santillanes v. State,* 765 P.2d 1147 (Nev.1988); *State v. Rough Surface,* 440 N.W.2d 746 (S.D.1989); *Spencer v. Commonwealth,* 384 S.E.2d 785 (Va.1989). The evidence before the court was sufficient to establish the admissibility of the tests under the *Frye* doctrine. *State v. Onken, supra.* Defendant's challenges to the procedures followed by Bell go to the weight of the evidence, not its admissibility. *State v. Moore,* 690 S.W.2d 453 (Mo.App.1985) [9]. The trial court did not err in admitting the evidence of the multisystem electrophoresis testing.

■ Defendant also claims that he was unduly limited in his cross-examination of Bell and in the restriction in the testimony that would be allowed of a potential expert witness for the defendant. As a result of the restrictions, defendant did not tender its expert as a witness. We find no merit to these contentions. Bell was cross-examined extensively on her procedures, her qualifications, her skill and knowledge and the value and accuracy of her opinions. What the trial court would not allow were questions which sought to attack the efficacy of the electrophoresis testing and therefore its admissibility. The trial court took the position that that issue had been resolved by its determination of the admissibility of the evidence. In that determination it was correct. The admissibility of the testing methods was a matter of law for the court. The reliability of the tests actually performed was a legitimate area of cross-examination and was allowed. We find no abuse of discretion.

■ Finally, as to the blood testing evidence, defendant contends the trial court erred in allowing Bell to testify that the victim's blood was found in only 7% of the black population. Defendant bases this contention on what it contends is a lack of foundation. This issue has been squarely addressed and resolved contrary to defendant's position in *State v. Onken, supra.* Bell was an expert and could give her opinion without giving the source of her opinion or having available that source.

We find no error relating to the bloodstain evidence.

## III.

### Little Michael's Statement

■ In his testimony little Michael denied that he had seen defendant leave the room with Alfred, Jr. and denied that he had made a statement to that effect. Defendant contends that the testimony of Wyatt was an attempt to impeach little Michael and that such is prohibited unless the witness to be impeached admits making a statement. We do not view the testimony of Wyatt as impeachment. Its admissibility comes from Sec. 491.075 RSMo 1986, which allows the admission, as substantive evidence, of statements made by children who witness certain crimes. The statute allows such statements made to third parties if the child is under twelve when making the statement (little Michael was seven), if the offense falls under Chapters 565, 566 or 568 RSMo (this crime was under 565), if the crime is performed on a child by another, if the court finds in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability and, if the child either testified at the proceeding or was unavailable as a witness (little Michael testified). The court held the requisite hearing and made the requisite findings. Those findings are discretionary. *State v. Bereuter,* 755 S.W.2d 351 (Mo.App.1988) [1]. At the time the statement was made there was no suspicion that Alfred, Jr. had been harmed or that defendant was in any way involved in his disappearance. The witness simply requested information from little Michael which was supplied immediately after the boy had awakened and before he had reason or thought to fabricate. We find no abuse of discretion in the court's finding of reliability. The statute clearly recognizes the problems inherent in obtaining accurate in-court testimony from children and authorizes utilization of extra-judicial statements made in an environment and under conditions where the statements evidence reliability. They are not admissible because

they are impeaching but because they carry a reliability suggesting their truthfulness. We find no error in admission of Wyatt's statement.

Subsequently the prosecution introduced testimony from police officer Burgoon and the Grand Jury court reporter that statements previously made by Wyatt of little Michael's statement differed slightly from Wyatt's in-court testimony. At trial Wyatt testified little Michael said he "thought" he saw his uncle take Alfred, Jr. to the basement. Burgoon and the court reporter testified to prior statements by Wyatt that little Michael said he "did" see his uncle take Alfred, Jr. to the basement. We need not reach defendant's challenge to the testimony of Burgoon and the court reporter. The difference between the two statements was minimal and given the strength of the state's case we cannot conclude that minimal difference affected the result. To the extent the testimony tended to bolster that of Wyatt we again are unable to conclude that that would have affected the result.

IV.

*Submissibility*

■ Defendant's final contention is that the evidence was insufficient to prove the crime of which defendant was charged and particularly the element of deliberation. The evidence heretofore recited establishes a circumstantial evidence case that the victim was murdered and that defendant was responsible for the killing. Defendant was the last adult seen in contact with the victim; he had previously struck the victim; the assault, at least in part, occurred in defendant's residence and in total within a few hundred feet of the residence in an area known to defendant; defendant was seen coming from the alley over which the victim's body was taken; a pool cue which could have been the murder weapon and a knife which could have been the decapitation instrument were found in defendant's residence, the latter under his mattress; an extension cord found under the body came from the same residence; material similar to that found over the body was in the residence; an empty box of plastic

bags was in the residence; plastic bags were found on the body; defendant had blood compatible with the victim's on his jeans when arrested; defendant had unidentifiable blood under his fingernails; the victim's blood is found in only 7% of the black population.

■ Deliberation may be inferred from the circumstances surrounding the homicide. *State v. Grubbs,* 724 S.W.2d 494 (Mo. banc 1987) [3]. The victim received multiple wounds to the head. Deliberation can be inferred from multiple attacks. *State v. Barnes,* 740 S.W.2d 340 (Mo.App.1987) [5,6]. Deliberation can also be inferred where defendant continues an attack after the victim is incapacitated. *State v. Mallett,* 732 S.W.2d 527 [1,2] (Mo. banc 1987) cert. den. 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). The victim was not only beaten senseless, but a portion of his brains were out of his head from which it may be inferred the attack continued after unconsciousness. Decapitation occurred after death. Defendant's prior assault on the victim occurred sometime before the final assault and defendant took the victim from that room into the basement, attacked him there, then removed him across a backyard, down an alley and into a vacant house. Given the minimal amount of blood in the defendant's residence and in the alley and backyard it is inferable that the attack continued after the victim was brought to the vacant house. All of these factors point to deliberation. The evidence was sufficient to support the verdict.

Judgment affirmed.

SATZ, P.J., and GRIMM, J., concur.