**STATE of Missouri, Respondent,**

v.

**Mary BASS, Appellant.**

**No. WD 59447.**

Missouri Court of Appeals, Western District.

May 21, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 2002.

Application for Transfer Denied Aug. 27, 2002.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Asst. Atty. Gen., Jefferson City, for Respondent.

John M. Schilmoeller, Assistant Appellate Defender, Kansas City, for Appellant.

Before: SPINDEN, C.J., and EDWIN H. SMITH and NEWTON, JJ.

EDWIN H. SMITH, Judge.

Mary Bass appeals the judgment of her convictions, after a jury trial in the Circuit Court of Jackson County, of two counts of murder in the second degree, § 565.021;[1] six counts of abuse of a child, § 568.060; and four counts of armed criminal action (ACA), § 571.015. As to her convictions on second degree murder and ACA, and two counts of abuse of a child, she was sentenced to eight consecutive life sentences. As to her convictions on the remaining four counts of abuse of a child, she was sentenced to prison terms of fifteen years on two counts and one year on the other two counts, with all four sentences to run concurrent with each other and the eight consecutive life sentences.

The appellant raises four points on appeal. In Point I, she claims that the trial court erred in admitting at trial, pursuant to § 491.075, the hearsay statements of the victims' brother, Jerry Bass, eight years old at the time of the statements, because in doing so the court erroneously declared that § 491.075 permitted the admission of out-of-court statements of a child-declarant under the age of twelve relating to an offense charged under Chapter 565, 566 or 568, even though the child was not a victim of such offense. In Point II, she claims that the trial court erred in overruling her *Batson* objection to the State's peremptory strike of the only African–American member of the venire panel, because the strike was racially motivated and the State's race-neutral explanation for the strike was pretextual. In Point III, she claims that the trial court plainly erred in asking her expert witness a question as to her prognosis for the appellant's recovery from her alleged mental illnesses because her right to a fair trial before an impartial judge and jury was violated in that the court's question improperly focused the jury's attention upon the potentially short amount of time that she might be held for treatment of her mental illnesses if the jury was to find her not guilty by reason of mental disease or defect. In Point IV, she claims that the trial court erred in overruling her motion for judgment of acquittal at the close of all of the evidence because "the state failed to produce sufficient evidence from which a jury could find, beyond a reasonable doubt, that [the appellant] did not suffer from a mental disease or defect excluding responsibility at the time of the alleged criminal acts."

### Facts

On October 20, 1999, officers of the Kansas City, Missouri, Police Department; emergency medical technicians; and members of the Kansas City, Missouri, Fire Department responded to a 911 call from the appellant's home at 300 South Elmwood, Kansas City, Missouri. Upon arriv-

1. All statutory references are to RSMo 2000, unless otherwise indicated.

**600**

al, they found the appellant kneeling on the living room floor near the head of her son, Larry Bass. Larry, Jerry and Gary, were eight-year-old triplets. Larry, who was extremely frail and emaciated, was not wearing any clothes besides a pair of socks. Displaying no signs of life, the paramedics declared Larry dead at the scene.

Several of the appellant's other children, Ronald Bass, Jr., Catina Bass, and Jerry, were at the scene and were visibly upset. A police officer, who had gone upstairs to one of the bedrooms, called for the paramedics after finding Gary lying on a vomit-stained mattress. Gary, who was also very emaciated, was screaming and crying when the paramedics arrived. While transporting Gary to the emergency room at Children's Mercy Hospital, the paramedics removed his socks and observed serious burns, which extended from below his knees to his feet. The paramedics also noticed that several of Gary's toes were dead and rotting, and that he displayed various contusions and abrasions on his back.

After arriving at the hospital, Gary was taken to the burn unit where he was treated by Dr. Steve Klem. At the time of his admission, Gary was 47 inches tall, but weighed only 32 pounds. Gary went into cardio respiratory arrest because of an imbalance in the levels of potassium and phosphorous in his bloodstream, but he was resuscitated by Dr. Klem and other medical personnel. Such chemical imbalances are often seen in someone who suffers from malnutrition. Dr. Klem then discovered that pseudomonas, bacteria that causes serious infections, were growing in Gary's bloodstream. Dr. Klem also noticed that Gary had symmetrical third-degree burns on both of his legs and feet, and concluded that his legs had been submerged in a very hot liquid. For the next several days, Gary was treated with large doses of epinephrine, in an attempt to stimulate his heart and prevent shock, but the treatment was unsuccessful and Gary died in the early morning hours of October 22, 1999.

Autopsies were then performed on Larry and Gary to determine their causes of death. When Larry was examined on October 21, 1999, he was 45 inches tall, but weighed only 31 pounds. Dr. Thomas Young, who performed the autopsy on Larry, found full-thickness immersion burns on his legs and feet, similar to the burns found on Gary. Dr. Young determined the cause of Larry's death to be starvation and bacteria-infected thermal burns, and classified the death as a homicide. Dr. Sam Gulino, who performed the autopsy on Gary, observed multiple scrapes and bruises all over his body, and concluded that he suffered from battered child syndrome. Dr. Gulino determined Gary's death was caused by complications from starvation and bacteria-infected burns to his legs and feet, and classified his death as a homicide.

The appellant was arrested and gave a videotaped statement to the police on October 20, 1999. During the interview with the police, the appellant said that she took food away from Larry and Gary and locked them up because they misbehaved. She mentioned that she would feed the boys bread and water when they were locked up. The appellant stated that on October 14, 1999, she came home from work and the boys were bickering and yelling, and she began arguing with them. At some point, she filled the bathtub with hot water and placed them in it. As soon as Larry and Gary got into the bathtub, they began screaming. When the appellant removed the boys from the tub, she could see that their legs were burned. The appellant told the police that she did

not seek any treatment for their burns because she was scared that people would think that she did it on purpose.

Upon further questioning by the police, the appellant stated that on October 20, 1999, she came home from work and found both Larry and Gary very sick. After she gave Larry some Tylenol and Pedialyte, she noticed that he had stopped breathing. The appellant told Jerry to call 911, while she tried to revive Larry with the odor from a bottle of Pine-Sol and a can of beer. Soon thereafter the emergency personnel arrived.

On June 13, 2000, the appellant was charged by indictment in the Circuit Court of Jackson County with two counts of murder in the second degree, § 565.021; four counts of ACA, § 571.015; eight counts of abuse of a child, § 568.060; and two counts of first degree endangering the welfare of a child, § 568.045. The two counts of endangerment, along with one count of abuse, were dismissed prior to trial.

The appellant's case proceeded to a jury trial on October 11, 2000. The State called seventeen witnesses, including emergency medical technicians (EMTs) and police officers who testified as to what they observed when they arrived at the appellant's home on October 20, 1999. In addition, the State called several Division of Family Services (DFS) employees and school teachers who testified as to the appearance and behavior of Larry and Gary immediately prior to their deaths. In that regard, the State called Janet Brown, an EMT; Melanie O'Donahue, a teacher; and Elizabeth Stevens, a DFS employee, to testify as to statements made to them by the victims' brother, Jerry, about how the appellant had treated Larry and Gary. The appellant objected to these three witnesses testifying as to what Jerry had told them inasmuch as it was inadmissible hearsay. The trial court overruled her objections,

finding that Jerry's statements were admissible under § 491.075. At the close of the State's case, the appellant made a motion for judgment of acquittal, which was overruled. Although the appellant did not testify in her own behalf, she did present evidence. Her evidence consisted primarily of several medical experts who testified in support of her asserted insanity defense. In rebuttal, the State called several of its own medical experts to refute the appellant's defense. At the close of all of the evidence, the appellant again moved for judgment of acquittal, which was also overruled. The case was submitted to the jury on October 20, 2000. The following day, the jury returned guilty verdicts on twelve of the thirteen counts submitted, convicting her of two counts of second degree murder, four counts of ACA, and six counts of child abuse, while acquitting her of one count of abuse.

On November 15, 2000, the appellant filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. On December 14, 2000, the trial court overruled the appellant's motion and sentenced her to eight consecutive life sentences on her convictions for second degree murder, ACA, and for two counts of abuse of a child. As to her convictions on the remaining four counts of abuse of a child, she was sentenced to prison terms of fifteen years on two counts and one year on the other two counts, with all four sentences to run concurrent with each other and the eight consecutive life sentences.

This appeal follows.

**I.**

In Point I, the appellant claims that the trial court erred in admitting at trial, pursuant to § 491.075, the hearsay statements of the victims' brother, Jerry Bass, eight years old at the time of the statements, because in doing so the court erroneously

declared that § 491.075 permitted the admission of out-of-court statements of a child-declarant under the age of twelve relating to an offense charged under Chapter 565, 566 or 568, even though the child was not a victim of such offense. Specifically, she claims that § 491.075 did not authorize the admission of the statements because the statute required that the declarant be a victim of one of the offenses charged under Chapter 565, 566 or 568 and the victims' brother was not, and that no other basis existed for the statements' admission. For its part, the State contends several bases existed for the trial court's admission of the hearsay statements in question, including admission under § 491.075, arguing that § 491.075.1 authorizes the admission of hearsay statements of a child-declarant as to a qualifying offense charged under Chapter 565, 566 or 568, without requiring that he or she be a victim of such an offense. We agree with the State's interpretation of the statute.

Whether the trial court here correctly interpreted and applied § 491.075 is a question of law, which we review *de novo*. *State v. Harney*, 51 S.W.3d 519, 532 (Mo.App.2001). " 'When interpreting statutes, our primary responsibility is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning.' " *Id.* (*quoting State v. Rousseau*, 34 S.W.3d 254, 259 (Mo.App.2000)). "The legislature 'is presumed to have intended what the statute says; consequently, when the legislative intent is apparent from the words used and no ambiguity exists, there is no room for construction.' " *Id.*

Recognizing that a young child can be easily intimidated into not testifying about offenses chargeable under Chapter 565, 566 or 568, making their detection and prosecution very difficult, if not impossible,

and the need to balance this consideration against the rights of the accused, our legislature enacted § 491.075, which creates an exception to the hearsay rule. *State v. Wright*, 751 S.W.2d 48, 52 (Mo. *banc* 1988). Section 491.075 reads:

1. A statement made by a child under the age of twelve relating to an offense under chapter 565, 566 or 568, RSMo, performed with or on a child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2)(a) The child testifies at the proceedings; or

(b) The child is unavailable as a witness; or

(c) The child is otherwise physically available as a witness but the court finds that the significant emotional or psychological trauma, which would result from testifying in the personal presence of the defendant, makes the child unavailable as a witness at the time of the criminal proceeding.

2. Notwithstanding subsection 1 of this section or any provision of law or rule of evidence requiring corroboration of statements, admissions or confessions of the defendant, and notwithstanding any prohibition of hearsay evidence, a statement by a child when under the age of twelve who is alleged to be victim of an offense under chapter 565, 566 or 568, RSMo, is sufficient corroboration of a statement, admission or confession regardless of whether or not the child is available to testify regarding the offense.

3. A statement may not be admitted under this section unless the prosecuting attorney makes known to the accused or his counsel his intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the accused or his counsel with a fair opportunity to prepare to meet the statement.

4. Nothing in this section shall be construed to limit the admissibility of statements, admissions or confessions otherwise admissible by law.

This section has passed repeated constitutional challenges, based on alleged violations of due process and equal protection. *Wright,* 751 S.W.2d at 52–53; *State v. Hester,* 801 S.W.2d 695, 697 (Mo. *banc* 1991). Our appellate court decisions have found that these constitutional mandates are met by the reliability and unavailability tests set forth in § 491.075.1. *Wright,* 751 S.W.2d at 52; *State v. Naucke,* 829 S.W.2d 445, 457 (Mo. *banc* 1992). The question presented in this point is not whether § 491.075 violated a constitutional right of the appellant or that the requirements of that section were met in introducing the statements in question, but whether § 491.075.1 applies to child-declarants under twelve years of age, other than victims.

■ We first note that both subsections 1 and 2 of the statute authorize the admission of hearsay statements of a child under twelve years of age, provided certain requirements are met. In that regard, the State, in contending that the statements in question here were admissible under § 491.075, argues that while the application of § 491.075.2 is expressly limited to a child "who is alleged to be a victim," no such limitation exists as to § 491.075.1. For her part, the appellant makes no attempt in her brief to interpret the statute by discussing the language used or to differentiate between the reach of the two subsections, but simply relies on this court's opinion in *State v. Merrill,* 990 S.W.2d 166 (Mo.App.1999), citing it for the proposition that the application of § 491.075 is limited solely to child victims in a case involving a qualifying offense charged under Chapter 565, 566 or 568.

Giving the language used its plain and ordinary meaning, § 491.075.1 clearly authorizes the admission of a hearsay statement of "a child under the age of twelve" at the time the statement was made, provided: (1) an offense has been charged under Chapter 565, 566 or 568; (2) the offense was "performed with or on a child by another"; (3) the statement sought to be introduced relates to such an offense; (4) the "reliability test" of § 491.075.1(1) is satisfied; and (5) the "unavailability test" of § 491.075.1(2) is satisfied. Contrary to the appellant's interpretation of § 491.075, reading that section in isolation, while it does require that an offense "performed with or on a child by another" be charged under Chapter 565, 566 or 568, there is nothing to suggest that the child-declarant referenced therein is required to be the victim of the charged qualifying offense in order for his or her hearsay statements to be admissible as substantive evidence under the statute.

As the State points out, unlike § 491.075.1, which refers to "a child under the age of twelve," § 491.075.2 expressly refers to "a child ... under the age of twelve *who is alleged to be* [*sic*] *victim* of an offense under chapter 565, 566 or 568." (Emphasis added.) The State argues that the specific reference in § 491.075.2 to a child-victim and the lack of such a reference in § 491.075.1 evinces a legislative intent that § 491.075.1 does not require the child-declarant to be a victim in order to admit his or her hearsay statements, as the appellant contends. We agree.

It is well settled, in interpreting a statute, that the legislature is presumed to have acted intentionally when it includes language in one section of a statute, but omits it from another. *Jantz v. Brewer*, 30 S.W.3d 915, 918 (Mo.App.2000). "A disparate inclusion or exclusion of particular language in another section of the same act is 'powerful evidence' of legislative intent." *Id.* Here, in specifically referencing a child-victim in § 491.075.2, while not doing so in § 491.075.1, the legislature expresses a clear intent to establish different requirements for the admission of the hearsay statements of a child-declarant offered as substantive evidence and the requirements for the admission of hearsay statements of a child-victim offered to corroborate a statement, admission or confession of a defendant. In that regard, as we discussed, *supra*, § 491.075.2, unlike § 491.075.1, does not require the satisfaction of the reliability test of § 491.075.1(1) and the unavailability test of § 491.075.1(2). For admission of a hearsay statement under § 491.075.2, there must only be a showing that: (1) the statement was made by a child under the age of twelve; (2) the child was the alleged victim of a charged offense under Chapter 565, 566 or 568; and (3) the statement is being offered to corroborate a statement, admission or confession of the defendant.

Differentiating in § 491.075 between the hearsay statements of a child-declarant who is not a victim from those of a child-victim, in the case of corroborating a statement, admission or confession of the defendant, is consistent with the legislature's approach in § 491.060(2), which deals with the competency of a child under ten years of age to testify. It reads, in pertinent part:

A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which the child is examined, or of relating them truly; provided, however, that except as provided in subdivision (1) of this section, a child under the age of ten who is alleged to be a victim of an offense pursuant to chapter 565, 566 or 568, RSMo, shall be considered a competent witness and shall be allowed to testify without qualification in any judicial proceeding involving such alleged offense. The trier of fact shall be permitted to determine the weight and credibility to be given to the testimony.

§ 491.060(2). The first proviso of § 491.060(2) creates a presumption that a child-witness under ten years of age is incompetent to testify, which can be rebutted "if the child appears to the trial judge to have the capacity both to receive just impressions and to relate them truthfully." *State v. Williams*, 729 S.W.2d 197, 199 (Mo. *banc* 1987). The second proviso removes from the presumption a child-victim in a Chapter 565, 566 or 568 case, who is allowed to testify without qualification. *Id.* However, in Chapter 565, 566 or 568 cases, the statute does not prohibit from testifying a child-declarant under ten years of age who is not a victim. It only requires that before doing so, the child-witness, unlike a child-victim, must be pre-qualified by the trial court to insure that he or she is "[]capable of receiving just impressions of the facts respecting which he is examined, or relating them truly." § 491.060(2). Similarly, § 491.075.2, in the case of a hearsay statement being offered to corroborate a statement, admission or confession of a defendant, differentiates between a declarant who is a victim and one who is not, allowing hearsay in the instance of a victim, without any qualification. It is important to note that in apparent recognition of the fact that greater assurances are needed to protect the accused's constitutional rights where hearsay (§ 491.075), as opposed to live testimony

(§ 491.060.2), is being allowed, § 491.075.1 requires that declarants, whether victims or not, must satisfy the reliability and unavailability tests set forth therein.

As noted in *Wright,* 751 S.W.2d at 52, many of the same policy considerations cited in *Williams* for the enactment of § 491.060 would apply with equal force to the enactment of § 491.075. In that regard in *Williams,* the court spoke of the difficulty in detecting and prosecuting offenses under Chapter 565, 566 or 568, given "an inherent lack of evidence linking the accused to the crime." 729 S.W.2d at 201–02. In discussing the need and justification for legislation such as § 491.060.2, the court stated:

> Scholars and legislators alike have for many years debated the propriety, or at least the permissible scope, of a child's testimony. The goal has always been to attain a proper balance between the competing interests of the child and those of the accused. The harsh confrontation between those interests arises predominantly in cases where, as here, the child is the only eyewitness to the crime. More often than not in these cases the only direct evidence connecting the accused with the crime is the testimony of the child. Other circumstantial evidence merely shows that the crime occurred. Consequently, offenders, who have chosen a young child as their victim, often avoid conviction when the child's testimony is unavailable. On the other hand, there is the accused's interest in obtaining a fair trial. Proponents of the accused's interest argue that the testimony of a truly incompetent young child increases the danger of sentencing an innocent man.

*Id.* at 199. Logically, this justification for § 491.060.2, would apply to § 491.075.1 with respect to not only child-victims in Chapter 565, 566 or 568 cases, but to child-

witnesses. This is so in that history teaches us that not only do many of these cases involve the victim being the lone eyewitness, as pointed out by the *Williams* court, but as in our case, involve the only eyewitnesses being the victim and other young children who were not victims. Logically, an offender predisposed to picking a victim based on tender years so as to insure that the offender will escape detection and prosecution, would be just as inclined to pick his or her victim based not only on the victim's being of tender years, but the only other eyewitnesses to the abuse being other children of tender years. This would be particularly true where the offender contemplates the death of the victim, such that the only eyewitnesses remaining would be young children. This would explain in part why abuse frequently occurs in family situations and in other such situations, such as day care centers or schools, where the only witnesses would be young children whom the offender can terrorize into not being forthcoming when placed on a witness stand or being so traumatized they are unable to testify at all. In light of this, the same policy reasons for allowing the hearsay statements of child-victims would apply to child-witnesses and would explain why the legislature did not specifically reference child-victims in § 491.075.1, as it did in § 491.075.2. In fact, in *State v. Foote,* 791 S.W.2d 879 (Mo.App.1990), which is the only case in which an appellate court of this state has been confronted with the admissibility under § 491.075 of hearsay statements of a child-witness, as opposed to a child-victim, the court opined, in affirming the admission of the same: "The statute clearly recognizes the problems inherent in obtaining accurate in-court testimony and authorizes utilization of extrajudicial statements made in an environment and under conditions where the

statements evidence reliability." *Id.* at 883.

As noted, *supra,* in claiming as she does in this point as to the interpretation of § 491.075 and its application, the appellant cites us to an opinion of this court, *State v. Merrill,* 990 S.W.2d 166 (Mo.App.1999), specifically the language of the opinion that provides: "In order to maintain the delicate balance of preserving the rights of the accused and protecting the security of the child, it is essential that courts strictly construe § 491.075 to restrict the admissibility of statements and testimony to *actual victims of offenses.*" *Id.* at 170 (emphasis added) (*citing State v. McGuire,* 892 S.W.2d 381, 385 (Mo.App.1995)). The State contends that this language from *Merrill* was merely dicta, which should not be followed because it is contrary to the plain language of § 491.075.1.

In holding as it did, the *Merrill* court relied on *State v. McGuire,* 892 S.W.2d 381, 385 (Mo.App.1995). In *McGuire,* which was decided by the Eastern District of this court, the defendant, who was convicted of attempted rape, § 566.030 RSMo 1986, claimed on direct appeal that the trial court erred in admitting certain out-of-court statements of the five-year-old victim because they were hearsay and unreliable. *McGuire,* 892 S.W.2d at 385. The court was not confronted, as we are here, with the issue of whether the hearsay statements of a child-witness, as opposed to a child-victim, are admissible under § 491.075. Without any discussion of the language of the statute, specifically the express reference to "victim" in § 491.075.2, but the lack of such a reference in § 491.075.1, the court simply stated that "[§ 491.075] allows the admission, as substantive evidence, of an out-of-court statement made by a child *who is an al-*

*leged victim of an offense under Chapter 565, 566 or 568 RSMo 1986.*" *Id.* (emphasis added). This italicized language of the opinion is almost identical to the language of § 491.075.2 RSMo 1986, which reads: "a child . . . who is alleged to be victim of an offense under chapter 565, 566 or 568."

Given the fact that the *McGuire* court was not asked to decide whether § 491.075.1 was limited to hearsay statements of child-victims and there is no language in the opinion to suggest that it found that the statute was so limited, its finding that § 491.075 allowed the admission of hearsay statements of child-victims is obviously not in conflict with our interpretation of the statute. There is nothing in *McGuire* to suggest that it was the Eastern District's position that § 491.075 only applied to the out-of-court statements of child-victims. In other words, it did not intend to be exclusive, only inclusive. To the contrary, in *Foote,* decided by the Eastern District prior to *McGuire,* the court made it crystal clear that § 491.075 applied to hearsay statements of child-witnesses, as well as child-victims in Chapter 565, 566 or 568 cases.

In *Foote,* like here, the defendant challenged on appeal the admission of the child-victim's brother's hearsay statements in convicting the defendant of first degree murder, under § 565.020 RSMo 1986. *Foote,* 791 S.W.2d at 883. The court in affirming the admission of the brother's hearsay statements stated that their "admissibility [came] from Sec. 491.075 RSMo 1986, which allows the admission, as substantive evidence, of statements made by children who *witness* certain crimes." *Id.* (emphasis added). In summary, as to *McGuire,* the court there, like the courts in countless other cases involving the application of § 491.075,[2] in referring to that

---

2. *See State v. Silvey,* 894 S.W.2d 662, 672 (Mo. *banc* 1995); *State v. Long,* 972 S.W.2d

section's allowing the admission of child-victims' hearsay statements, did not address whether its application was limited to child-victims. Those courts simply concluded, and correctly so, that the statute covered child-victims in Chapter 565, 566 or 568 cases. We now turn to *Merrill.*

In *Merrill,* the defendant appealed his convictions of two counts of first degree murder, § 565.020.2, and two counts of armed criminal action (ACA). 990 S.W.2d at 168. He was charged and convicted of killing the father of four-year-old Kayla. On appeal, the defendant challenged the admission, under § 491.075, of Kayla's hearsay statements to the police, identifying her father's killers, including the defendant. This court, although finding that her statements were admissible on other grounds, ruled that they were not admissible under § 491.075. *Id.* at 170. This was a correct ruling in that, although the murder offenses were charged under Chapter 565, none of the challenged statements were made by a child "relating to an offense performed with or on a child by another," as required for admission under § 491.075.1, or made by a child "who is alleged to be [*sic*] victim of an offense under chapter 565, 566 or 568," as required for admission under § 491.075.2. The victim in *Merrill* was an adult, not a child. Thus, the *Merrill* court, in ruling that Kayla's hearsay statements were not admissible under § 491.075, did not have to reach the issue, presented here, of whether that section applied to hearsay statements of child-witnesses to a qualifying offense under § 491.075.1. In fact, the *Merrill* court pointed out that in the companion case of *State v. Kidd,* 990 S.W.2d 175 (Mo.App.1999), this court had already recognized that Kayla's statements were

not admissible under § 491.075.1 in that the challenged hearsay statements in question did not relate to an offense under Chapter 565, 566 or 568 "performed with or on a child by another," quoting § 491.075.1. 990 S.W.2d at 170. Hence, there can be no doubt that the *Merrill* court clearly understood that Kayla's statements were inadmissible because there was no qualifying offense charged and did not have to reach the issue of whether § 491.075.1 was limited to child-victims.

Looking at the language in *Merrill* that the appellant is relying upon: "In order to maintain the delicate balance of preserving the rights of the accused and protecting the security of the child, it is essential that courts strictly construe § 491.075 to restrict the admissibility of statements and testimony to actual victims of offenses," *id.,* it is, at least arguable that the court was interpreting the section the same way as does the appellant here. However, given the *Merrill* court's apparent understanding of the dispositive issue before it as to the application of § 491.075, that no qualifying offense involving a child-victim was charged; its reliance on *McGuire,* which obviously did not restrict the application of § 491.075 to child-victims; and the lack of any discussion addressing the fact that the legislature, while expressly referencing victims in § 491.075.2, did not do so in § 491.075.1, leads us to the inescapable conclusion that the restriction the *Merrill* court was referencing was not with respect to the status of the declarant, but the offense charged. In other words, that § 491.075.1 was restricted to cases in which the defendant is charged with "an offense under chapter 565, 566 or 568, RSMo, performed with or on a child by

559, 562–63 (Mo.App.1998); *State v. Goad,* 926 S.W.2d 152, 155 (Mo.App.1996); *State v.*

*Walker,* 972 S.W.2d 623, 627 (Mo.App.1998).

another." To the extent that *Merrill* could be interpreted otherwise, it should not be followed.[3]

Because we find that § 491.075.1 extends to child-witnesses, as well as child-victims, where a qualifying offense under that section is charged, the trial court did not err in admitting the challenged statements of the victims' brother, Jerry, under that section, as claimed by the appellant in this point.

Point denied.

## II.

In Point II, the appellant claims that the trial court erred in overruling her *Batson* objection to the State's peremptory strike of the only African–American member of the venire, Toni Scott, because the strike was racially motivated and the State's race-neutral explanation for the strike was pretextual. As to the racially-neutral reason for striking Scott, the prosecutor stated that he struck her because in response to the *voir dire* question, "Have you ever confronted a behavior problem with your children that you felt that you could not solve?" she indicated that she had encountered problems with her children that she could not solve, which might make her sympathetic to the appellant. In claiming that the State's reason was pretextual, the appellant contends: (1) the record does not support the fact that Scott ever made the response relied upon by the State for its strike; and (2) the State failed to strike a white venire person who answered the question in the same fashion as the State believed Scott had answered.

■ A party is prohibited by the Equal Protection Clause of the United States Constitution from using a peremptory strike to remove a prospective juror solely on the basis of race. *Batson v. Kentucky,*

476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court's finding as to a *Batson* challenge will be upheld, unless we find that it is clearly erroneous. *State v. Smith,* 5 S.W.3d 595, 596 (Mo.App.1999). A trial court's finding is clearly erroneous if we are left with a definite and firm impression that a mistake has been made. *State v. Shaw,* 14 S.W.3d 77, 82 (Mo.App. 1999).

■ Missouri has adopted a three-step process for asserting and ruling on a *Batson* challenge to the peremptory strike of a prospective juror. *State v. Deck,* 994 S.W.2d 527, 537 (Mo. *banc* 1999). First, the party challenging the strike must object and identify the protected class to which the prospective juror belongs. *Id.* Second, the striking party must provide a reasonably specific and clear, race or gender-neutral explanation for its strike of this individual. *Id.* If such an explanation is given, the burden then shifts to the objecting party to show that the explanation is pretextual and that the strike was truly motivated by the race or gender. *Id.* As to this three-step process in our case, the record reflects:

MR. SCHLEGEL:—we respectfully contend that the prosecutor's use of a peremptory strike against the sole African American venire person in this panel, Venireperson No. 21, was exercised in violation of the decision of *Batson v. Kentucky* and the Equal Protection Clause of the 14th Amendment of the Constitution of the United States.

We would ask that the prosecutors come forward with a race-neutral reason for removing her and denying her the right to serve.

THE COURT: Okay. Let's hear a race-neutral reason.

---

**3.** This opinion has been reviewed and approved by order of the court *en banc.*

MR. MILLER: It was in response to the defense attorney question regarding behavior problems that could not be solved. Persons who answered with their own kids were No. 21, 23 and 26. The Court had already excused No. 23. So, therefore, we struck 21 and 26. We didn't reach No. 60.

THE COURT: Right.

MR. SCHLEGEL: Your Honor, our response to that is again respectfully that the proffered reason is insufficient to satisfy a standard of strict scrutiny.

We have an African American defendant, a woman, who is about to be tried by a jury of 12 Caucasian people. Of the large panel that we had to select a jury from there was only one African American present. That was No. 21.

And while we do not dispute the fact that she responded to a question about having insoluble behavioral problems with her children, she also responded to a question about punishing with a belt, saying that she would not do that, which ought to make her a favorable juror for the prosecution in this case.

On that basis we respectfully contend that the race-neutral reasons proffered are insufficient.

To that we add the fact that the person who will now sit as Juror No. 4, Venireperson No. 4, a woman, a white woman, who also responded to the question about insoluble behavioral problems with children will be allowed to sit despite the fact that she gave that answer.

On that combined basis, Your Honor, we ask that the prosecutor's peremptory strike against Venireperson No. 21 be set aside and that venire person be allowed to sit as a juror in this case.

MR. MILLER: It is not even clear from the questionnaire if this person even is African American.

THE COURT: The woman who said her children died of Tay–Sachs?

MR. SCHLEGEL: That's correct, Your Honor. Can the Court take judicial notice of the fact she is African American?

THE COURT: Yes, she is. I might add she was the only one who is up here.

This is going to be a strange ruling. I believe the reasons articulated by the State probably are sufficient, but I would prefer that we struck somebody else. I guess there was only one African American. Out of an abundance of fair play I would just as soon leave the one on there if we can. Take a look at it. If you just don't want to do it that is fine. The ruling will stand.

But if there was somebody else you were wavering on then—

MR. MILLER: The problem we have—

THE COURT: Because we are leaving No. 4 on there who also answered the question.

MS. MAHONEY: That was not with her own children. That was with students. It was even kind of chuckled at.

THE COURT: That is true.

MR. MILLER: The problem with that and this question is throughout the defendant's videotaped confession she just talks about how she cannot handle these kids. She can't handle these kids.

We had three jurors who said, "I had problems with my kids that I couldn't solve." We would have struck three of those, 21, 23 and 26—well, 23 was already gone. So we struck 21 and 26.

THE COURT: Well, I think, Mr. Schlegel, that does articulate a basis for permissible striking here.

I hate to lose her.

MR. SCHLEGEL: Our contention, Your Honor, is the state of the law

610

permits the Court to rule that a sufficient race-neutral reason is simply not satisfactory to the Court under the circumstances of a particular case.

THE COURT: I know. I just had the occasion to look at this, as a matter of fact; but their burden isn't, you know, this high, now that we are using our hands.

It doesn't have to be particularly a rational reason if it is just something that has some basis and logic within the experience of the voir dire.

MR. SCHLEGEL: I quite agree with that, Your Honor. I'm thinking about the case that says that it is still the obligation of the Court to in effect look to see if the veil of that facially sufficient reason should be penetrated.

If the Court is not convinced that this was not for race then the Court is empowered to correct that.

THE COURT: Well, I don't believe that their motives for removing her are based on race. I think they have a reason.

So like I said I wouldn't mind trying to save her too, but I will accept that reason.

The question raised in this point is whether the record supports the trial court's ruling that the appellant did not carry her burden of showing that the State's reason for striking Scott was pretextual and was truly motivated by race.

We first address the appellant's claim that the State's race-neutral reason for striking Scott was pretextual because the record indicates that the stated basis for the State's strike, her response to a *voir dire* question posed by the defense counsel, does not appear of record. In regard to the question and answer relied upon by the State for striking Scott, the record reflects that the appellant's trial counsel asked the following *voir dire* question of the entire panel:

MR. SCHLEGEL: Okay. I have a question for parents. You may have grown kids. You may have kids you are raising now.

Have you ever confronted a behavior problem with your children that you felt that you could not solve? They are doing something, and they shouldn't be doing it, and you can't change that? Has anyone encountered that?

The record further indicates that several members of the venire responded to the question, including Scott. As to Scott's response, the record reflects that she asked, "Well, would you repeat the question? Please repeat it." In response to Scott's request, defense counsel stated:

MR. SCHLEGEL: Yes, I will. Thank you, I thought I had it as good as I could get it.

The question is: Have you ever had the experience as a parent that your kids are doing something that you want them to stop because they shouldn't be doing that, but you can't get them to stop no matter what you try? If that's been your experience, really, really frustrated with changing behavior, I need to know who you are.

The record reflects that Scott never responded to this question. Thus, contrary to what was stated by both the State and defense counsel, when arguing over whether the State had given a race-neutral reason for its strike of Scott, Scott never stated that she had encountered problems with her children that she was unable to solve. The question then is whether the trial court erred in denying the appellant's *Batson* objection where the stated basis for the State's strike proved to be unfounded.

"In determining whether the prosecutor struck a venireperson because

of his or her race, the trial court looks at the totality of the facts and circumstances surrounding the case." *State v. Brown,* 998 S.W.2d 531, 542 (Mo. *banc* 1999) (*citing State v. Parker,* 836 S.W.2d 930, 939 (Mo. *banc* 1992)). "A trial court's findings as to a *Batson* challenge are entitled to great deference because its decision depends largely on the evaluation of intangibles such as credibility and demeanor." *State v. Jackson,* 969 S.W.2d 773, 775 (Mo. App.1998) (citation omitted). The decisive question to be determined by a trial court facing a *Batson* challenge is whether the State's race-neutral explanation for a peremptory challenge should be believed. *State v. Winters,* 949 S.W.2d 264, 267 (Mo. App.1997). There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. *State v. Lopez,* 898 S.W.2d 563, 569 (Mo.App.1995). The evaluation of a prosecutor's state of mind based on his or her demeanor and credibility lies particularly within the province of the trial judge. *State v. Wilhite,* 858 S.W.2d 293, 296 (Mo. App.1993).

■ The record reflects that the appellant did not raise below the issue of whether Scott had actually given the *voir dire* response relied upon by the State for its strike. "Where a defendant fails to lay a foundation for findings of pretext on the state's explanations in the trial court, the defendant may not challenge the state's explanations on appeal." *State v. Pride,* 889 S.W.2d 163, 165 (Mo.App.1994) (citation omitted). Thus, the issue of whether the State's race-neutral reason for striking Scott was pretextual, because the record indicated that she never gave the *voir dire*

response asserted by the State for its strike, is not preserved for our review. *Id.* However, even assuming that this basis for challenging the trial court's denial of the appellant's *Batson* objection was properly preserved, she still would not prevail thereon.

■ The fact that Scott never actually gave the *voir dire* response on which the State relied for its strike is not determinative of the issue that we must decide in determining whether the appellant carried her burden of demonstrating that the State's reason for striking Scott was not race-neutral, but pretextual. The issue in a *Batson* challenge, such as the one before us, is not whether the reason given for a strike is true in fact, but whether the striking party believes it to be true, even if only a hunch, and the strike is not inherently racial on its face. *State v. Smith,* 944 S.W.2d 901, 912 (Mo. *banc* 1997).

■ There is no question from the record that both the prosecutor and the appellant's trial counsel believed that Scott had answered affirmatively when asked whether she had faced any problems with her children that she could not solve.[4] There is nothing in the record to suggest that the State knowingly misrepresented the record to the trial court in order to assert its racially neutral explanation for its strike of Scott, nor does the appellant contend that that was the case. Hence, the only question for us in this point is whether the record supports the trial court's determination that the State's explanation for its strike was otherwise facially race-neutral and did not reflect an inherently racial intent. In that regard, the appellant claims that the record does

4. Although speculation, most probably what occurred was that when Scott raised her hand to ask counsel to restate the question, both sides indicated in their trial notes that she responded to the question, but failed to note that she responded solely to ask that the question be repeated.

not support the trial court's ruling that the State's reason for striking Scott was not pretextual in that the State failed to strike a white venireperson who had answered the *voir dire* question under scrutiny in the same way as Scott was mistakenly thought to have answered. "The existence of similarly-situated white jurors is probative of pretext under *Batson* analysis, but it is not dispositive, in determining whether use of peremptory challenges is discriminatory." *Brown,* 998 S.W.2d at 542 (*citing State v. Nicklasson,* 967 S.W.2d 596, 613 (Mo. *banc* 1998)). The failure to strike a similarly-situated venireperson is relevant in determining whether a strike was racially motivated, but it is not dispositive of the issue. *Nicklasson,* 967 S.W.2d at 613.

Here, the record would suggest material distinctions between the way Scott was believed to have answered the *voir dire* question under review and the way the alleged similarly-situated prospective juror answered to justify not striking her, but striking Scott, on grounds that were not racially motivated. In support of her contention that the State failed to strike a similarly-situated white venireperson, the appellant points to the fact that the State did not strike venireperson Paulsmeyer,[5] who the record reflects gave essentially the same answer as Scott was thought to have given to the question concerning insoluble problems with children. In contending that Paulsmeyer should be viewed in a different light than Scott, the State argues that her response was materially different from Scott's. In that regard, the State points to the fact that in answering the question, Paulsmeyer was referring to school children that she taught, not her own children, which response drew laughter from the other members of the venire. It is reasonable to conclude that such a

response would not have caused the same concern for the State as the response thought to have been given by Scott. Obviously, the State was primarily concerned about any juror serving who might be sympathetic to the plight of a frustrated parent in disciplining his or her child, not a frustrated teacher. This distinction was sufficient for the trial court to reject the notion that the failure to strike Paulsmeyer was proof of the State's racial intent in striking Scott.

Point denied.

### III.

In Point III, the appellant claims that the trial court plainly erred in asking her expert witness, Dr. Marilyn Hutchinson, a question as to her prognosis for the appellant's recovery from her alleged mental illnesses because her right to a fair trial before an impartial judge and jury was violated in that the court's question improperly focused the jury's attention upon the potentially short amount of time that she might be held for treatment of her mental illnesses if the jury was to find her not guilty by reason of mental disease or defect. The State contends that the question posed by the trial court was not improper because it did not show any bias or hostility toward the appellant and was merely asked for the purpose of clarifying the witness's earlier testimony. We agree.

At trial, in support of her insanity defense, the appellant called Dr. Hutchinson, a psychologist, to testify as to her opinion of the appellant's mental condition at the time that the offenses were alleged to have been committed by the appellant. After the questioning of Dr. Hutchinson had concluded, the record reflects that the trial court asked her:

---

5.  The record does not disclose her first name.

Q: In your opinion for someone with these problems that you have listened to, what is the prognosis for recovery for the future anyway?

A: It would depend on the kind of treatment. If Mary had access to extremely competent inpatient hospitalization where she was going to get adequate medication, adequate treatment—by that I mean daily treatment—I would say that, you know, in maybe ten years there could be some sufficient recovery.

It would be my guess that since I know that those are not the conditions under which the state hospitalization operates that ten years would be insufficient under the kind of care that she is likely to receive in a state hospital and that she would likely be there longer than ten years before she would be competent.

Q: Okay. I think that's all we need.

Defense counsel then asked one follow-up question concerning the appellant's treatment and when her mental illnesses would likely be brought under control. After she replied to this follow-up question, Dr. Hutchinson was excused by the trial court.

■■■ The appellant did not object to the trial court's question of Dr. Hutchinson. As such, the appellant's claim of error, as to the propriety of the court's question, was not preserved for appellate review. *State v. Brown,* 58 S.W.3d 649, 652–53 (Mo.App.2001). The only review then would be for plain error under Rule 30.20, which the appellant requests. Rule 30.20 provides, in pertinent part, that "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "A plain reading of the rule indicates that plain error review involves a two-step process." *State v. Williams,* 9 S.W.3d 3, 12

(Mo.App.1999). The first step in the process requires an examination by the reviewing court to determine whether the claim for review "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,' " or in other words, whether, on the face of the claim, plain error has, in fact, occurred. *State v. Brown,* 902 S.W.2d 278, 284 (Mo. *banc* 1995). If the reviewing court cannot make such a determination, the court should "decline to exercise its discretion" to review a claim for plain error under Rule 30.20. *Id.* "If plain error is found on the face of the claim, then the rule authorizes, as a matter of court discretion, a second step to determine whether the claimed error resulted in manifest injustice or a miscarriage of justice." *Williams,* 9 S.W.3d at 12.

■■■ It is imperative that a trial judge maintains absolute impartiality during criminal proceedings so as to ensure that the defendant receives a fair trial. *State v. Webber,* 982 S.W.2d 317, 321 (Mo. App.1998). "Accordingly, the court must maintain a position of neutrality and should avoid any conduct which might be construed as indicating a belief on the part of the judge as to the defendant's guilt." *Id.* (citation omitted). A question or comment from a trial judge must not express his or her opinion of evidence in the case, *State v. Hudson,* 950 S.W.2d 543, 548 (Mo. App.1997); however, the judge may ask questions which seek to develop the truth more fully and to clarify earlier testimony. *State v. Swigert,* 852 S.W.2d 158, 161 (Mo. App.1993). In regard to clarifying a witness's testimony:

[t]he judge has a duty to comprehend what a witness says as much as it is his duty to see that the witness communicates with the jury in an intelligible manner. A trial judge can do this in a fair and unbiased way. His attempt to

do so should not be a basis of error. Where the testimony is confusing or not altogether clear the alleged "jeopardy" to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding.

*Id.* (*quoting Ray v. United States,* 367 F.2d 258, 261 (8th Cir.1966)). In determining whether a trial court's question of a witness constitutes prejudicial error, the primary issue is whether the question deprived the defendant of a fair and impartial trial. *Hudson,* 950 S.W.2d at 548. "Whether prejudice occurred depends on the context and the words in each case." *Id.* (*citing State v. Koonce,* 731 S.W.2d 431, 441 (Mo.App.1987)). There is no error if the trial judge does not express his or her opinion as to the nature, content or truthfulness of the evidence. *Webber,* 982 S.W.2d at 321.

On its face, the appellant's claim of plain error does not warrant review in that the trial court's question does not indicate bias or prejudice by it towards the appellant. In addition, it cannot be said that the challenged question of the trial court expressed the court's opinion as to the content or truthfulness of the witness's testimony. It is apparent that the trial court, in asking the question, was simply attempting to clarify the witness's earlier testimony.

Point denied.

### IV.

■ In Point IV, the appellant claims that the trial court erred in overruling her motion for judgment of acquittal at the close of all of the evidence because "the state failed to produce sufficient evidence from which a jury could find, beyond a reasonable doubt, that [the appellant] did not suffer from a mental disease or defect excluding responsibility at the time of the alleged criminal acts." The appellant's claim misconstrues § 552.030, which governs the insanity defense.

The review of a trial court's denial of a motion for judgment of acquittal is the same as reviewing a claim that there was insufficient evidence to convict the defendant of the charged offense. *State v. Goddard,* 34 S.W.3d 436, 438 (Mo.App. 2000). As such, we accept as true all of the evidence favorable to the State, including favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *State v. Parnell,* 21 S.W.3d 896, 899 (Mo.App. 2000). "We only determine whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt, not whether the verdict was against the weight of the evidence." *Goddard,* 34 S.W.3d at 438 (*citing State v. Smith,* 944 S.W.2d 901, 916 (Mo. *banc* 1997)).

■ The appellant is correct in asserting that the State, as a matter of due process, has the burden of proving each and every element of a criminal offense, and its failure to do so requires the reversal of any conviction obtained under those circumstances. *State v. Kelly,* 43 S.W.3d 343, 350 (Mo.App.2001). However, she is incorrect in asserting that in her case the State had the burden to show at trial that she did not suffer from a mental disease or defect excluding responsibility and that it failed to carry that burden.

■ Pursuant to § 552.030.1, "[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct." With respect to this defense, § 552.030.6 provides, in pertinent part:

All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct .... The issue of whether any person had a mental disease or defect excluding responsibility for such person's conduct is one for the trier of fact to decide upon the introduction of substantial evidence of lack of such responsibility. But in the absence of such evidence, the presumption shall be conclusive. Upon the introduction of substantial evidence of lack of such responsibility, the presumption shall not disappear and shall alone be sufficient to take that issue to the trier of fact. The jury shall be instructed as to the existence and nature of such presumption when requested by the state and, where the issue of such responsibility is one for the jury to decide, the jury shall be told that the burden rests upon the accused to show by a preponderance of the evidence that the defendant was suffering from a mental disease or defect excluding responsibility at the time of the conduct charged against the defendant.

§ 552.030.6. Thus, to be successful at trial on the insanity defense, the defendant must first present substantial evidence that he or she lacked responsibility for the offense because he or she suffered from a mental disease or defect at the time of the offense. *State v. Kreyling,* 890 S.W.2d 414, 416 (Mo.App.1995). Assuming that the defendant satisfies this burden, he or she must still overcome the statutory presumption of sanity by showing by a preponderance of the evidence that he or she suffered from a mental illness that precluded him or her from appreciating the nature, quality or wrongfulness of his or her criminal conduct. § 552.030.6; *Kreyling,* 890 S.W.2d at 416–17.

The defendant in *State v. Moss,* 789 S.W.2d 512 (Mo.App.1990), raised the same claim as the appellant does in this case.

In *Moss,* the defendant pled not guilty by reason of mental disease or defect excluding responsibility for the offenses of kidnapping and ACA, but was ultimately found guilty on both counts by a jury. 789 S.W.2d at 513. On appeal, the defendant challenged his convictions by claiming that the trial court should not have submitted his case to the jury because the record demonstrated that he suffered from a mental illness excluding responsibility. *Id.* The Southern District of this court held that:

The defendant's second point is, in substance, that he proved by a preponderance or greater weight of the evidence that he was suffering from a mental disease or defect excluding responsibility at the time he committed the acts charged and therefore the trial court should have directed a verdict of acquittal at the close of all the evidence. There is substantial evidence in the record, which would justify a finding that defendant was suffering from a mental disease or defect excluding responsibility and there is substantial evidence to the contrary, but a recitation of the evidence is not necessary. Essentially, the defendant argues that as a matter of law, he was not guilty by reason of mental disease or defect. We reject this argument. Even if the experts had testified unanimously that the defendant suffered from a mental disease at the time the crimes charged were committed—and they did not—such evidence would not have authorized removal of the issue of criminal responsibility from the jury. The prosecution has no burden to prove the sanity of the accused. By statute, the defendant is presumed to be free from mental disease or defect and that presumption alone is sufficient to take the issue to the jury even when

it is controverted by substantial and un-contradicted evidence to the contrary. *Id.* at 513–514 (citations omitted).

Applying § 552.030.6 and the reasoning of *Moss* here, even if the State had not introduced substantial evidence of the appellant's sanity at the time that the offenses occurred, which our review indicates it did, the statutory presumption of sanity was sufficient to take the issue to the jury such that the appellant's motion for acquittal was properly denied by the trial court.

Point denied.

## Conclusion

The judgment of the circuit court convicting the appellant of two counts of murder in the second degree, § 565.021; six counts of abuse of a child, § 568.060; and four counts of armed criminal action, § 571.015, is affirmed.

SPINDEN, C.J., and NEWTON, J., concur.