# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1923

_____

D. Scott Forrester, Conservator of the    *
Estate of Jerry Bass; Jerry Bass,    *
   *
         Appellees,    *
   *   Appeal from the United States
     v.    *   District Court for the
   *   Western District of Missouri.
Mary Bass; Tony Dixon,    *
   *
         Defendants,    *
   *
Kimberly Rosa; Melissa Johnson,    *
   *
         Appellants.    *

_____

Submitted: November 18, 2004
Filed: February 7, 2005

_____

Before RILEY, McMILLIAN, and GRUENDER, Circuit Judges.

_____

RILEY, Circuit Judge.

Mary Bass (Bass), with her live-in partner, cruelly tortured and starved her five minor children. Two eight-year old sons, Larry and Gary, died from the abuse. D. Scott Forrester (Forrester), as personal representative of the estates of Larry and Gary Bass and as conservator of the estate of Jerry Bass, the surviving triplet, and Jerry Bass (Jerry), individually, filed this civil rights and wrongful death action against

Kimberly Rosa (Rosa) and Melissa Johnson (Johnson), two social workers employed by the Missouri Department of Social Services (MDSS) Division of Family Services (DFS). Forrester pled federal due process and state law claims, seeking damages resulting from Rosa's and Johnson's alleged violations of Missouri's child welfare statutes.

Rosa and Johnson moved for summary judgment, asserting the affirmative defenses of the public duty doctrine, official immunity, and qualified immunity. The district court determined the public duty doctrine did not apply, but granted summary judgment to Rosa and Johnson on the state law claims because Rosa and Johnson had acted in their discretionary roles and, consequently, are officially immune from suit. The district court denied Rosa and Johnson qualified immunity on the federal due process claims. Rosa and Johnson appeal the denial of qualified immunity. Concluding Forrester failed to plead viable federal due process claims, we reverse.

## I. BACKGROUND
### A. Factual Summary

In March 1995, DFS received the first of many hot line calls alleging Bass was battering and starving her five children, Rodney, Catina, and triplets, Larry, Gary, and Jerry. DFS investigated various abuse and neglect reports and visited the Bass home; however, DFS never deemed the hot line reports warranted local law enforcement notification or removal of the children from the home. On August 16, 1999, DFS received a hot line call in Jefferson City, Missouri. The caller reported: (1) scratches were seen on Larry's chest; (2) Bass was starving her children as punishment; (3) Bass had locked Rodney in the basement; (4) the children were searching through trash cans for food; (5) all five children appeared dehydrated and malnourished with sunken eyes and protruding ribs; and (6) the children were so weak they could not drink from a glass without assistance. The hot line information was faxed immediately to Kansas City, Missouri, where a DFS employee screened the

information according to MDSS protocol and determined a family assessment and services approach,[1] rather than an investigation,[2] was warranted.

Johnson was assigned to perform a family assessment that day on the Bass family. Johnson went to the Bass home, where she met Bass's live-in boyfriend, Tony Dixon (Dixon) at the front gate. Dixon told Johnson Bass was working and the children were not at home. Johnson told Dixon to have Bass call her. The following day Bass called Johnson at work, and Johnson returned to the Bass home to perform a family assessment. During her visit, Johnson talked to Bass, and interviewed three of the children, Ronald, Catina, and Jerry. Johnson did not see or interview Larry and Gary. Bass told Johnson that, due to their behavioral problems, Larry and Gary lived with their natural father. The children also told Johnson that Larry and Gary were living with their father. Dixon, however, told Johnson that Larry and Gary were out of town visiting their grandparents. Johnson recognized the discrepancy and recorded Dixon's seemingly contradictory statement on the family assessment form. Johnson also noted Bass "was to contact [Johnson] if Larry + Gary returned home." At no time did Johnson verify Larry's and Gary's whereabouts.

---

[1]James C. Harrison (Harrison), MDSS's Assistant Deputy Director for Child Services, testified a family assessment approach is selected for a "relatively mild or moderate case of abuse and neglect, injuries are not severe, and may be [a] first-time call[,] . . . and the report is not that serious but might have well been addressed through an assessment in which we go in and, in addition to looking at risk and safety of a child, look at the family service needs and how those service needs might be met by Division or other community agencies."

[2]Harrison testified "an investigation generally is a report that by virtue of the allegations would constitute a criminal offense if they were true. These are generally the serious reports; physical abuse and neglect, sexual abuse, generally . . . a crime against a person."

Johnson spent an hour in the Bass home. She confined her visit to the living room, which she observed to be very clean. Johnson smelled food cooking on the kitchen stove. Bass denied ever punishing her children by locking them in the basement or by withholding food from them. The children told Johnson that Bass took good care of them. The children denied Bass withheld food, locked them in the basement, or otherwise abused them. Bass attested that Johnson assured Bass she would follow-up with another visit in two weeks. The family assessment form does not indicate any intention to follow-up, nor did Johnson follow up with the family.

Following her home visit, Johnson determined no social services were needed, and she concluded the Bass children were safe, despite never seeing Larry and Gary. Johnson turned in her family assessment report without completing a mandatory safety assessment. By a form letter dated September 7, 1999, Johnson informed Bass DFS was not opening a case "because we agreed during our discussion that your family is not in need of services." Two weeks later, Johnson's supervisor, Rosa, reviewed the report and completed the safety assessment, thereby certifying the Bass home was safe, without ever being in the Bass home or seeing the Bass children.

Two months after DFS closed the Bass file, Bass forced Larry and Gary to submerge their feet and lower legs into scalding bath water, causing severe burns. On October 20, 1999, Kansas City police, fire, and emergency medical technicians responded to a 911 call made from the Bass home. State v. Bass, 81 S.W.3d 595, 599 (Mo. Ct. App. 2002). Upon arrival, emergency personnel observed Bass kneeling on the living room floor near Larry, who was lifeless, emaciated, and naked except for a pair of socks. After paramedics declared Larry dead, they proceeded upstairs, where they discovered Gary, emaciated and lying on a vomit-stained mattress. En route to the emergency room, the paramedics removed Gary's socks and discovered third-degree burns on his feet and lower legs, several gangrene toes, and multiple abrasions on his back. Despite intensive medical treatment, Gary died two days later. Id. at 600.

To ascertain their causes of death, autopsies were performed on the boys. At death Larry measured 45 inches and weighed 31 pounds; Gary measured 47 inches and weighed 32 pounds. Id. The autopsies revealed the boys died from starvation and bacteria-infected thermal burns to their legs and feet. The autopsy reports classified both deaths as homicides. Id.

The State of Missouri indicted Bass with two counts of second-degree murder, four counts of armed criminal action, eight counts of child abuse, and two counts of first-degree endangerment. Id. at 601. The state also indicted Dixon, who pled guilty to child abuse and endangerment charges, and was sentenced to twenty years. A jury convicted Bass of two counts of second-degree murder, four counts of armed criminal action, and six counts of child abuse. The trial court sentenced Bass to eight consecutive life sentences and to four additional term-of-year sentences. Id. The Missouri Court of Appeals affirmed Bass's convictions. Id. at 616.

As a result of the prosecutions, authorities learned Bass and Dixon had deceived Johnson about Larry's and Gary's whereabouts. On August 17, 1999, Larry and Gary were not living with their natural father, nor were they visiting their grandparents. Instead, sometime before Johnson arrived, Bass and Dixon locked Larry and Gary in the basement, bound their hands and feet together with rope, and gagged their mouths with socks. Bass and Dixon threatened the other three children with starvation and beatings if they told Johnson the truth about their brothers' treatment or their whereabouts.

### B.    Procedural History

Following the criminal convictions, Forrester filed this lawsuit, contending Johnson's and Rosa's noncompliance with mandatory state-created procedures violated Larry's and Gary's federal due process rights as well as state law. Johnson and Rosa moved for summary judgment, arguing they are entitled to qualified immunity because Forrester cannot prove any violation of clearly established

constitutional rights. Johnson and Rosa further claim they owed no duty to Larry and Gary because the boys were not in state custody.

The district court analyzed the plain language of sections 210.109[3] and

---

[3]Mo. Rev. Stat. § 210.109.3 established procedures for the state's child protection system, and provided, in pertinent part, that DFS shall:

(2) Forward the report to the appropriate division staff who shall determine, through the use of protocols developed by the division, whether an investigation or the family assessment and services approach should be used to respond to the allegation. . . . *The division may investigate any report, but shall conduct an investigation involving reports, which if true, would constitute violation of section 565.050, [first-degree assault], . . . 568.030 [abandonment], 568.045 [endangerment in first degree], 568.050 [endangerment in second degree], 568.060 [abuse], . . . or an attempt to commit any such crimes;*

*. . . ;*

(4) *Contact the appropriate law enforcement agency upon receipt of a report of a violation of [the above statutes, inter alia]. . . , or an attempt to commit any such crimes, and shall provide such agency with a detailed description of the report received. . . . ;*

(5) Cause a thorough investigation or family assessment and services approach to be initiated within twenty-four hours of receipt of the report from the division, . . . *If the report indicates the child is in danger of serious physical harm or threat to life, an investigation or family assessment and services approach shall include direct observation of the subject child within twenty-four hours of the receipt of the report;*

*. . . ;*

(8) *Provide services, in cases in which the family assessment and services approach is used . . . ;*

210.145[4] of the Missouri Revised Statutes and determined these statutes clearly

. . . .

Mo. Rev. Stat. § 210.109 (Supp. 1998) (emphasis added).

[4]Section 210.145, establishing a telephone hot line and central registry for child abuse reports, in pertinent part, provided:

> 5. *Upon receipt of a report, which, if true, would constitute violation of section . . . 565.050 [first-degree assault], . . . , 568.030 [abandonment], 568.045 [endangerment in first degree], 568.050 [endangerment in second degree], 568.060 [abuse], . . . or an attempt to commit any such crimes, the local office shall contact the appropriate law enforcement agency and provide such agency with a detailed description of the report received. . . . [T]he local division office shall request the assistance of the local law enforcement agency in . . . investigation of the complaint . . . .*
>
> 6. The local office of the division shall cause a thorough investigation to be initiated immediately or no later than within twenty-four hours of receipt of the report from the division, . . . *[I]f the report indicates the child is in danger of serious physical harm or threat to life, an investigation shall include direct observation of the subject child within twenty-four hours of the receipt of the report.*
>
> . . . .
>
> 10. Protective or preventive social services shall be provided by the division to the family and subject child and to others in the home to prevent abuse or neglect; to safeguard their health and welfare; and to help preserve and stabilize the family whenever possible. . . .
>
> . . . .

Mo. Rev. Stat. § 210.145 (1994) (emphasis added).

establish certain rights for children and families who enter the Missouri social services system through reports of abuse or neglect. The district court identified these rights as being: "(1) The right to have reports of abuse investigated by division employees, when the report indicates a possible violation of certain criminal laws, or indicates that the child is in danger of physical harm or threat to life; (2) The right to have the appropriate law enforcement agency contacted and provided a description of the report, and to have division employees request the assistance of the local law enforcement agency; and (3) The right to preventive and protective services to prevent abuse or neglect." Additionally, the district court determined these statutory sections assign DFS employees the duties of updating the information system and maintaining records, and observing directly, within twenty-four hours, a child reported to be in danger of serious physical harm.

Flowing from these statutory duties, the district court reasoned the "plaintiffs had a property interest in the rights conferred by [sections] 210.109 and 210.145, specifically in the right to an investigation of the report that their mother was abusing them, and the right to preventive and protective services provided by the state." In a footnote, the court noted Johnson and Rosa owed the plaintiffs the initial protective service of contacting law enforcement and requesting their assistance in the investigation of the case.

In analyzing the substantive due process claims, the district court found the "plaintiffs had a property interest in their right to a child abuse investigation, as well as a liberty interest in bodily integrity and, naturally, a fundamental right to life." The court expounded:

> Melissa Johnson should have known that proceeding to conduct a family assessment of the Bass case despite knowing the report called for an investigation would deprive plaintiffs of their clearly established right to a child abuse investigation. . . . Melissa Johnson and Kimberly Rosa should have known that making material omissions and false statements

-8-

on the evaluation form and closing the Bass case prematurely would deprive plaintiffs of clearly established rights to an investigation and to preventive and protective services. Defendants therefore are not entitled to qualified immunity on plaintiffs' substantive due process claims.

The district court denied summary judgment on the federal due process claims, but granted summary judgment on the state law claims because the defendants had engaged in discretionary acts and were entitled to official immunity. Forrester does not appeal the dismissal of his state law claims.

## II.    DISCUSSION

We must determine whether Johnson's and Rosa's failure to comply with mandatory state-created procedures outlined in sections 210.109 and 210.145 constituted procedural and substantive due process violations protected under the Fourteenth Amendment. For purposes of this appeal, we assume Johnson and Rosa failed to perform their mandated statutory duties by not: (1) conducting an investigation; (2) directly observing Larry and Gary Bass within twenty-four hours of the hot line call; (3) contacting law enforcement, providing a detailed description of the abuse report, and requesting law enforcement assistance with an investigation; and (4) providing preventive and protective services.

Rosa and Johnson appeal the district court's denial of summary judgment, finding Rosa and Johnson are not protected by qualified immunity. Generally, we do not have jurisdiction to decide an appeal arising from the denial of summary judgment; however, under the collateral order doctrine, an order denying qualified immunity is immediately appealable. Behrens v. Pelletier, 516 U.S. 299, 307 (1996); Beck v. Wilson, 377 F.3d 884, 888-89 (8th Cir. 2004).

### A.    Qualified Immunity

We review de novo a denial of qualified immunity. McCoy v. City of Monticello, 342 F.3d 842, 846 (8th Cir. 2003). Rosa and Johnson are entitled to

qualified immunity unless their alleged conduct violated "clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The law is clearly established if it gives the defendant officials "fair warning" that their conduct violated an individual's rights when the officials acted. Hope v. Pelzer, 536 U.S. 730, 739-40 (2002).

In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court framed the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [officials'] conduct violated a constitutional right?" "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable offic[ial] that [her] conduct was unlawful in the situation [she] confronted." Id. at 202. Officials do not lose their qualified immunity because of a mistaken, yet reasonable belief, nor do officials lose their immunity because of a reasonable mistake as to the legality of their actions. Id. at 205-06; McCoy, 342 F.3d at 846. Guided by these principles, we now proceed to analyze whether sections 210.109 and 210.145 of the Missouri statutes create property or liberty interests protected under the Fourteenth Amendment.

## B.  Procedural Due Process

The Due Process Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 2.  Property interests protected by due process are not created by the Constitution but, rather, "are created and their dimensions are defined, by existing rules or understandings that stem from an independent source such as state law." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985)

(citation omitted). The Supreme Court has ruled "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989).

Attempting to sidestep DeShaney, Forrester argued, and the district court agreed, the due process claims in Count I are not based on the Due Process Clause, but instead are based on Missouri's child protection statutes that confer on abused and neglected children an entitlement to receive investigative as well as preventive and protective services. DeShaney expressly declined to consider whether the relevant child protection statutes gave the plaintiff an "entitlement" to due process protection. Id. at 195 n.2. As such, we agree DeShaney does not expressly control the procedural due process claims.

Our analysis begins by examining first whether the child protection statutes at issue confer any protected interests. Only if we find a protected interest do we examine whether the deprivation of the protected interest was done in accordance with due process. See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989). In Board of Regents v. Roth, 408 U.S. 564, 576 (1972), the Supreme Court defined a property interest as an interest "a person has already acquired in specific benefits." The Court explained that to have a property interest in a benefit, an individual claiming the interest "must have more than an abstract need or desire . . . [or] a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. at 577.

A state-created liberty interest arises when a state imposes "substantive limitations on official discretion." Olim v. Wakinekona, 461 U.S. 238, 249 (1983). We determine whether a state law creates an enforceable liberty interest by "examin[ing] closely the language of the relevant statutes and regulations." Thompson, 490 U.S. at 461. "[T]he most common manner in which a State creates

-11-

a liberty interest is by establishing 'substantive predicates' to govern official decision-making, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." Id. at 462 (citation omitted). The Court also articulated a requirement that statutes and regulations must contain "'explicitly mandatory language,' *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." Id. at 463. "In sum, the use of 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion, forces a conclusion that the State has created a liberty interest." Id.

Sections 210.109 and 210.145 charged DFS personnel with the duties of receiving reports of child abuse and neglect, and determining whether a family assessment and services approach or an investigation should be employed to respond to the report. See Mo. Rev. Stat. § 210.109.3(1)-(2) (Supp. 1998). In cases in which a child abuse report, if true, would constitute a crime or attempted crime against the subject child or children, the statutes required DFS personnel to conduct an investigation, contact the appropriate law enforcement agency, provide law enforcement with a detailed report, and request its assistance. Id. §§ 210.109.3(3)-(4); 210.145.5 (1994). The statutes also mandated that, within twenty-four hours of receiving such a report, DFS personnel must initiate a thorough investigation, including direct observation of any subject child or children reported to be in danger of serious physical harm or threat of life. Id. §§ 210.109.3(5); 210.145.6. Furthermore, the statutes required DFS personnel to provide protective and preventive services to the subject child or children and to others in the home. Id. §§ 210.109.3(8), (12), (16)-(17); 210.145.10-11.

We have not considered previously whether these challenged Missouri child protection statutes bestow upon reportedly abused children a property or liberty interest in social services. We have, however, previously considered an identical

issue in the context of a Minnesota child welfare statute and related procedural regulations, and determined they neither "bestow . . . a property interest in social services[,]" nor "create a constitutional liberty interest in due process." Doe v. Hennepin County, 858 F.2d 1325, 1328 (8th Cir. 1988); Myers v. Morris, 810 F.2d 1437, 1469 (8th Cir. 1987), abrogated on other grounds, Burns v. Reed, 500 U.S. 478 (1991). The Minnesota statute at issue in both cases–section 626.556 of the Minnesota Statutes–imposed a reporting duty on individuals with knowledge of child abuse or neglect, and investigative and record-keeping duties on law enforcement authorities and social service agencies that receive child abuse reports, as well as duties on local welfare agencies to offer protective social services. See Myers, 810 F.2d at 1469 (citing Minn. Stat. Ann. § 626.556 (West 1983 and Supp. 1987)).

In Myers, we concluded the Minnesota child welfare statute, at most, "establishes guidelines to be followed as a matter of state law and neither confers nor embodies any constitutionally-protected right." Id. The following year, in Doe, we noted that, although the plaintiffs "desired or even expected the social services set forth in the Minnesota statute, they ha[d] no legitimate claim of entitlement." Doe, 858 F.2d at 1328. We explained in Doe that in order to have a legitimate entitlement, the benefit must be specific, i.e., clearly definable, and we provided several examples of clearly definable benefits, including public assistance, social security income, and unemployment benefits. Id. In contrast to these specific benefits, we explained the provision of Minnesota's statutorily defined "social services is qualified by the considerable discretion placed in the hands of those who administer it." Id. at 1329. We also noted the "lack of specificity of the Minnesota statute." Id.

The Minnesota statute examined in Doe and Myers is not identical to the Missouri statutes relied upon here, and the facts in Doe and Myers, both of which involved the emergency removal of children from parental custody following reported child abuse, are converse to those before us. Nonetheless, we conclude the legal reasoning employed in these earlier cases should apply. Similar to the Minnesota

statute, sections 210.109 and 210.145 of the Missouri statutes codify procedures for administering the state's child protection system, the telephone hot line, and the central registry. Sections 210.109 and 210.145 contain "explicit mandatory language," e.g., an investigation is required when a child abuse report, if true, would constitute a crime or attempted crime against a child; notification of law enforcement, with a request for assistance, and direct observation of the child within twenty-four hours are also required under the same circumstances; and social services must be provided to the child and family.

Despite explicit language requiring DFS officials to comply with certain procedures, the statutes contain no substantive predicates expressly limiting the discretion of DFS officials "by mandating the outcome to be reached upon a finding that the relevant criteria have been met." See Thompson, 490 U.S. at 462 (citation omitted). The statutes do not mandate the particular substantive outcomes of required investigations, law enforcement notification and intervention, direct observation of subject children, and the provision of social services. See Mo. Rev. Stat. §§ 210.109(3)-(5), (8), (12), (16)-(17) (Supp. 1998); 210.145.5-.6, .10-.11 (1994). Nor do the statutes define mandatory social services, or dictate how, when, or for how long these social services must be provided. Instead, the statutory language simply mandates particular preliminary actions be undertaken and authorizes the provision of social services, thereby leaving the particular substantive outcome in each case to the sound discretion of trained social workers and law enforcement officers. See id.

We agree with the Second Circuit's ruling that where an administrative process does not require specific substantive outcomes, but merely *authorizes and directs* particular actions and remedies, the administrative process does not create "entitlements" subject to constitutional protections under the Fourteenth Amendment. See Sealed v. Sealed, 332 F.3d 51, 56 (2d Cir. 2003). Other circuits, analyzing similarly drafted child welfare statutes, have reached this same conclusion. See Doe v. Dist. of Columbia, 93 F.3d 861, 868 (D.C. Cir. 1996) (declaring "process alone

does not give rise to a protected substantive interest: by codifying procedures for investigating child abuse and neglect reports, D.C. has not assumed a constitutional obligation to protect children from such abuse and neglect"); Tony L. v. Childers, 71 F.3d 1182, 1186 (6th Cir. 1995) (ruling state-created procedural rights "only give Plaintiffs an expectation that a certain procedure will be followed," and declaring "[a]n expectation that some sort of action will be taken is not enough. . . . [A] plaintiff must have an expectation that a particular result will follow from a particular, required action."); Doe v. Milwaukee County, 903 F.2d 499, 503-04 (7th Cir. 1990) (rejecting a procedural due process claim for failing to investigate child abuse, finding no "entitlement" in such procedures, and ruling the "procedures themselves are not 'benefits' within the meaning of Fourteenth Amendment jurisprudence").

Recently, in a case filed by children alleging abuse while in foster care, a recognized exception under DeShaney, the Second Circuit ruled that "the detailed and comprehensive procedures for investigating potential child abuse mandated by state law[,] . . . standing alone, create no independent *substantive* entitlements, whose deprivation might trigger application of the Due Process Clause." Sealed, 332 F.3d at 57. The Second Circuit reasoned that "'[e]levating a state-mandated procedure to the status of a constitutionally protected' liberty or property interest, would make process 'an end in itself' rather than a requirement whose 'constitutional purpose is to protect a substantive interest in which the individual has a claim of entitlement.'" Id. at 57 n.5 (citation omitted).[5]

---

[5]Because the children were in state custody and the court determined the mandatory statutory language–"*shall authorize* any employee of the department or any law enforcement officer to remove the child . . . from such surroundings without the consent of the child's parent or guardian"–was ambiguous, the Second Circuit certified to the Connecticut Supreme Court the question whether the mandatory "shall authorize" language required emergency removal of the plaintiffs or only authorized the Commissioner to seek emergency removal based on the exercise of discretionary judgment. Id. at 59-60. The Missouri statutes relied upon in this case do not mandate or otherwise authorize emergency removal by DFS or law enforcement officials of

Thus, based on the plain statutory language and court precedent, we hold sections 210.109 and 210.145 of the Missouri Revised Statutes, which were in effect in August 1999, did not create specific, constitutionally protected property or liberty interests in state-created investigative, preventive, and protective social services. Finding no protected interests, we need not decide what, if any, procedural process was due.

### C.    Substantive Due Process

Forrester also claims the failure of Johnson and Rosa to comply with state-created statutory procedures violated Larry's and Gary's substantive due process rights to bodily integrity and their fundamental rights to life. While DeShaney does not control Forrester's procedural due process claims, DeShaney squarely forecloses his substantive due process claims. Declaring a state has no general duty to protect individuals from abuse committed by private actors, DeShaney, 489 U.S. at 197, the Supreme Court acknowledged a state may owe an affirmative duty to protect individuals when they are placed in state custody, or when the state acts affirmatively to create the danger to which the individuals become subject. See id. at 198-201; Burton v. Richmond, 370 F.3d 723, 727 (8th Cir. 2004). As DFS never placed Larry and Gary in state custody, the special custodial relationship theory does not apply.

Alternatively, Forrester advances a state-created danger theory, contending Johnson's and Rosa's affirmative acts of jointly filing the Bass family assessment report with material omissions and false representations rendered Larry and Gary, as well as their siblings, more vulnerable to continued child abuse and ensured preventive and protective social services would not be provided to the Bass family. In Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990), we recognized the DeShaney "analysis establishes the possibility that a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has

children believed to be in imminent danger of physical harm.

taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action."

Forrester argues the filing of a false family assessment report and the failure to follow state protective procedures increased Larry's and Gary's vulnerability to continued abuse and deprived them and their family members of critical social services. The record, however, simply does not substantiate the requisite causal connection. The filing of the Bass family assessment report and other acts by Johnson and Rosa were not affirmative acts of endangerment, which "created greater risks to [the Bass children] than the ones to which [they were] originally exposed." S.S. v. Mullen, 225 F.3d 960, 963 (8th Cir. 2000) (en banc). Instead, as the majority found in S.S., the state action here was effectively "the same as if [the state] had done nothing." Id. In DeShaney, the state once had taken temporary custody of the child; even so, the Supreme Court reasoned:

> [W]hen [the State] returned [the boy] to his father's custody, [the State] placed him in no worse position than that in which he would have been had [the State] not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the boy].

489 U.S. at 201. In this case, the State of Missouri never had custody of Larry and Gary, and Johnson's and Rosa's actions, at most, left the Bass children in the same perilous situation that existed on August 16, 1999, when DFS responded to the hot line call. No constitutionally recognized causal nexus exists.

Even if Forrester could establish a sufficient causal connection between state action and the ensuing private acts of violence, his substantive due process claims still must fail because Forrester cannot demonstrate the requisite degree of offensive conduct or deliberate disregard by Johnson and Rosa necessary to establish substantive due process violations. "Before official conduct or inaction rises to the

level of a substantive due process violation[,] it must be so egregious or outrageous that it is conscience-shocking." Burton, 370 F.3d at 729. The dreadful abuse suffered by the Bass children was egregious. But private parties, not state actors, inflicted the severe physical abuse that killed Larry and Gary.

While we do not condone any official negligence contributing to this tragic case, we conclude Johnson and Rosa did not engage in official conduct so egregious or outrageous as to shock the contemporary conscience. See County of Sacramento v. Lewis, 523 U.S. 833, 848 n.8 (1998). The record does not portray Johnson as an apathetic or dilatory social worker who saw and ignored wanton child abuse. Based upon what transpired inside the Bass home on August 17, 1999, Johnson's failure to conduct an investigation, to contact law enforcement, and to verify the whereabouts of the boys, while erroneous, and maybe naive in retrospect, cannot be considered conscience-shocking. Johnson took what she saw and what she heard at face value. Only after the two young boys died did everyone realize Johnson had misjudged the actors and the scene.

Nor was Rosa's supervisory conduct conscience-shocking. While Rosa should not have filled in missing information on Johnson's report and completed the safety assessment without personal knowledge of the conditions inside the Bass home and the well-being of each family member, her actions were neither egregious nor outrageous. Rosa simply extrapolated from erroneous information contained in Johnson's report. The record contains no evidence that either Rosa or Johnson (1) knew their representations were false, or (2) deliberately disregarded a known risk of harm to the Bass children.

This case manifests exceptionally depraved conduct by two private individuals. Johnson's and Rosa's conduct, while arguably negligent, clearly does not descend to this base level. The Supreme Court in DeShaney explained the emotional and constitutional balancing as follows:

> Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [victims and their families] to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State . . . , but by [the parent]. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them. In defense of them it must also be said that had they moved too soon to take custody of the [child] away from the [parent], they would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection.

DeShaney, 489 U.S. at 202-03. We conclude Forrester failed to plead viable substantive due process claims.

## III.  CONCLUSION

State courts, and not federal courts, are the appropriate forum to enforce state child protection laws. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984) (declaring "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"). A federal court should not usurp state power by enforcing state-created procedures that guarantee no substantive outcomes.

Because Forrester cannot demonstrate the Missouri statutes establish a property or liberty interest protected under the Fourteenth Amendment and because Johnson's and Rosa's conduct does not shock the contemporary conscience, Forrester has failed to allege a violation of a clearly established due process right, and Rosa and Johnson are entitled to qualified immunity. We reverse the denial of qualified immunity for Rosa and Johnson and remand the case to the district court for further proceedings consistent with this opinion.

_____